**James B. PERIGO, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 87S00–8603–CR–316.

Supreme Court of Indiana.

Aug. 4, 1989.

David O. Kelley, Boonville, for appellant.

Linley E. Pearson, Atty. Gen., Cheryl Lynn Greiner, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

A jury found appellant James B. Perigo guilty of murder, a felony; feticide, a class C felony, and two counts of attempted murder, class A felonies. Ind.Code §§ 35–42–1–1(1), 35–42–1–6, 35–42–1–1 and 35–41–5–1 (Burns 1985 Repl.). The trial court sentenced Perigo on each conviction, respectively, to fifty years, five years, thirty years, and thirty years, with each term to run consecutively. His sentence totals 115 years in prison.

Perigo pursued a romantic relationship with Kathy Evans for several years. Perigo testified that they were engaged to be married, though the relationship was sometimes tumultuous. One altercation led Perigo to remove all of his possessions from Evans' apartment. On another occasion, Perigo pointed a shotgun at two of Evans' friends, Jon Cates and Donna Madden. This led to Perigo's arrest for criminal

recklessness. He was released on bond from that charge when he committed the crimes at bar. Evans became pregnant while she was seeing Perigo and told him that he had impregnated her.

On April 13, 1985, Perigo phoned Evans at 5 a.m. Evans told Perigo that she had been on a date with another man. Perigo had some previous knowledge of Evans' relationship with the other man. Perigo went to Evans' apartment and confronted her about the relationship.

Evans told Perigo their relationship was finished. When he asked about her pregnancy, she told him she was going to give up the child for adoption. He then accused her of having sexual intercourse with the other man, who had been at the apartment earlier. Evans made several denials but when Perigo continued to pressure her, she finally responded: "Yes, I did just [have intercourse with] him and his cum is still inside me. Do you want to see?" She then pointed to her groin. She also added that she did not know by whom she was pregnant.

Perigo reacted by rushing into another room where Cates and Madden were asleep. He stabbed Cates in the chest with a knife, and then slashed Madden's neck superficially and sliced off one of her fingertips when she put her hand between his knife and her neck. Cates and Madden escaped and ran to a nearby house, but Perigo trapped Evans and beat her head and abdomen with a baseball bat. Evans died and her fetus was terminated.

Perigo raises four issues in this direct appeal:

I. Whether the trial court erred by denying his motion in limine and overruling his objection to the prosecutor's closing argument that words alone were insufficient provocation to reduce murder to manslaughter;

II. Whether the trial court erred in admitting as evidence gruesome photographs, about which Perigo offered to stipulate;

III. Whether the trial court erred by permitting the prosecution's cross-examination of Perigo on his knowledge about the difference between manslaughter and murder; and,

IV. Whether the trial court erred by denying Perigo's motion to dismiss based upon the State's request for a dealth-qualified jury.

## I. *Words as Provocation*

Perigo argues that the trial court erred when it overruled his objection and denied his motion in limine to the prosecution's closing argument on the law of provocation.

The prosecutor had quoted from *Vasseur v. State* (1982), Ind., 430 N.E.2d 1157. He then said to the jury: "our Supreme Court, the Supreme Court of Indiana, has approved a statement of law that words alone are not sufficient provocation to reduce an offense from murder to manslaughter." At that point Perigo's attorney objected, by saying that "the law is that tauntings of the nature we've talked about, of a sexual nature, confessions of illicit sex are sufficient provocation for a voluntary manslaughter verdict." The court overruled this objection.

The trial court then excused the jury, and Perigo's attorney moved in limine that the prosecutor be ordered "not to argue that Indiana law provides that confession of illicit sex by a fiance is insufficient provocation as a matter of law to warrant a manslaughter verdict. I believe it is the law that insulting words alone are insufficient—are insufficient provocation. But it is also the law that a confession of a wife or fiance of illicit sex is sufficient provocation to—to warrant a manslaughter verdict."

Perigo asserts in his brief that the trial court erred by overruling his objection to the prosecution's closing argument because:

All that is required to reduce a homicide from murder to voluntary manslaughter is sufficient provocation to excite in the mind of the defendant such emotions as either anger, rage, sudden resentment or terror as may be sufficient to obscure the reason of an ordinary man, and to

prevent deliberation and premeditation, to exclude malice, and to render the defendant incapable of cool reflection. *Love v. State* (1977), 267 Ind. 302, 369 N.E.2d 1073. *See also, Russell v. State* (1981), 275 Ind. 679, 419 N.E.2d 973, and *Bryan v. State* (1983), Ind., 450 N.E.2d 53.

From the above-noted cases and the description of the facts in this particular case [it] is clear that words alone can be sufficient provocation if those words are in fact sufficient to meet the standard of *Love* as set forth above.

Perigo also refers to Ind.Code § 35–42–1–3 [1] (Burns 1985 Repl.) as support for his argument.

The State argues that a motion in limine does not serve to obtain a final ruling on the admissibility of evidence, citing *e.g., Johnson v. State* (1985), Ind., 472 N.E.2d 892; *Green v. State* (1984), Ind., 469 N.E.2d 1169. While this is true, Perigo adequately preserved this issue by objecting to the prosecutor's argument at the time.

■ The trial court properly overruled Perigo's objection and correctly denied his motion in limine. Words alone are not sufficient provocation to reduce murder to manslaughter. *Vasseur*, 430 N.E.2d 1157; *New v. State* (1970), 254 Ind. 307, 259 N.E.2d 696, 702; *Boyle v. State* (1886), 105 Ind. 469, 480, 5 N.E. 203, 210 ("The court did not err in directing the jury that mere words do not constitute such a provocation as will reduce an unlawful killing from murder to manslaughter."); *Murphy v. State* (1869) 31 Ind. 511, 514 ("But it should be remembered that words only—however abusive and insulting they may be—cannot constitute a sufficient provocation ... and reduce the offense from murder to manslaughter.") These precedents inform our interpretation of Ind.Code § 35–42–1–3 (Burns 1985 Repl.), which we take to be consistent with a century of caselaw.

In some circumstances, words may be combined with actions engendering sufficient provocation to reduce an offense from murder to manslaughter. That is the very point in the rule that words *alone* are not sufficient provocation to reduce an offense from murder to manslaughter. Even the highly emotional words in the case at bar are still just that—words.

## II. *Gruesome Photographs*

Perigo argues that the trial court erred by admitting into evidence photographs (State's exhibits 2, 3, 4 and 5) of the murder victim and of her fetus. Perigo argues this issue on two levels. First, he argues that the inflammatory or prejudicial nature of the photographs outweighed their probative value. Second, he argues that his offer to stipulate to the evidentiary value of these photographs should be considered in weighing the admissibility of the photographs. We find no error in the trial court's admission of the exhibits.

■ Admission of photographic evidence at trial is within a trial court's discretion, whose ruling we will not disturb except for abuse of discretion. *Wesby v. State* (1989), Ind., 535 N.E.2d 133. That photographs depict gory, revolting, or inflammatory details of the crime is not sufficient basis for reversal, unless they are without relevance to any material issue. Photographs are generally admissible as long as they depict the subject of testimony which would be admissible if related orally by a witness. *Id.* All evidence is relevant if it tends to prove or disprove a material fact in the case or sheds any light on the guilt or innocence of the accused. *Cox v. State* (1985), Ind., 475 N.E.2d 664.

Perigo suggests that the utterly revolting nature of these photographs outweighs their relevance to the issues. These photographs are indeed revolting, but the purpose of relevant evidence is to prove, however slightly, the material issues. This cannot be done sometimes without present-

---

1. This code section provides as follows:
A) A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a class B Felony.

B) The existence of sudden heat is a mitigating factor that reduces what otherwise would. be murder under section 1(1) of this chapter to voluntary manslaughter.

ing disagreeable evidence. Revolting crimes generate revolting evidence.

Next, Perigo argues that his offer to stipulate the evidentiary value of these photographs obviated the need for the jury to view them. Simply put, Perigo urges this Court to consider an offer of stipulation in the balancing test of relevancy versus prejudicial effect. Perigo seems to argue that the trial court should have required the State to accept such a stipulation and prohibited use of the photographs as evidence.

■ A party may refuse to stipulate to any facts. An offer to stipulate does not affect the trial court's consideration of the admissibility of evidence.

■ A trial court and the jury may learn through viewing an exhibit what they might have learned through listening to testimony describing it. *See Thomas v. State* (1971), 256 Ind. 309, 268 N.E.2d 609. Certainly, some exhibits are inadmissible because of their prejudicial nature or lack of relevance, but an adversary's offer to stipulate does not bear on admissibility. Each adversary must be permitted to offer and admit evidence solely on admissibility standards. Accepting Perigo's argument would unnecessarily deny each side the proper independence with which to present its case.

### III. *Prosecution's Questioning*

■ Perigo argues that the trial court erred by denying his motion for mistrial, which was based upon the prosecutor's cross-examination of him. The interrogation in contention is:

Q. [Prosecutor] You've learned something else though down there in those months of thinking about this, too, haven't you? That's the difference between voluntary manslaughter and murder. Haven't you learned the difference between those in those four months you've had to think about this?

A. [Perigo] Yes.

Q. So, when you decided in the afternoon of April the 13th to give your second statement and cooperate with the police, you didn't know those differences, did you?

MR. ROBERT CANADA [Perigo's attorney at trial]: Your honor, may we approach the bench?

Counsel then moved for a mistrial, outside the presence of the jury. Perigo argued that the questioning implied a fabricated defense. Judge Edward Campbell agreed that the inference suggested by defense counsel might be drawn but it was "certainly not necessarily the only inference." Judge Campbell ruled that the questioning did not rise to the level of *Hossman v. State* (1985), Ind.App., 473 N.E.2d 1059, and denied the motion. Perigo's counsel also made a motion in limine on this issue. It was denied.

Upon return of the jury, the prosecution asked:

Q: I think, Mr. Perigo, what I was referring [to] was the one before—the difference between murder and voluntary manslaughter. And would you answer that question.

A. Between murder and involuntary manslaughter?

Q. Voluntary manslaughter, sir.

A. Voluntary.

Q. Yes.

A. I'd heard of voluntary manslaughter, but I really didn't know the difference.

That is the entire record on Perigo's assertion that the prosecutor misbehaved by implying Perigo's defense was fabricated.

Perigo argues his claim of prosecutorial misconduct solely upon the precedent of *Hossman v. State.* Perigo further asserts that the above questioning requires a mistrial under the test of *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843.

We need not reach the *Maldonado* test because we hold that this questioning is not prosecutorial misconduct under *Hossman.* In *Hossman,* the Court of Appeals found misconduct when the prosecution used "fabricated defense" as its theme throughout the trial. In the prosecutor's opening statement, he asserted that the defense witnesses were "burglars and

thieves," "courtroom regulars," and "have been witnesses prior in Circuit Court," irrelevant comments which violated the Indiana Code of Professional Responsibility, Disciplinary Rule 7–106(c)(1). 473 N.E.2d at 1063. In the prosecutor's closing argument, he bluntly asserted:

> I had made a decision in this trial I was going to call their witnesses before the State's evidence was put on. Before they got their acts together, before they had an opportunity to create stories so I wouldn't have to listen to perjury again.

The prosecutorial conduct in *Hossman* was not the work of a subtle quilter with needle and thread but that of an eager blacksmith with hammer and anvil. The Court of Appeals stated, "Even had Hossman not objected to these final argument remarks, we would review them as fundamental error and reverse." *Id.* at 1065.

The scope and extent of cross-examination is within the sound discretion of the trial court, and we reverse only when an abuse of discretion is shown. *Williams v. State* (1986), Ind., 492 N.E.2d 28. Perigo argues that permitting this questioning is an abuse of discretion because it implied a fabricated defense. Judge Campbell correctly noted that more than one implication might be drawn from this questioning. Further, impeachment is a legitimate part of cross-examination and this prosecutor worked with a needle rather than a hammer. The limited questions asked of Perigo were within the bounds of effective cross-examination and did not constitute prosecutorial misconduct.

### IV. *Impartiality of a Death–Qualified Jury*

Perigo argues that the trial court erred by denying his motion to dismiss for denial of the sixth amendment right to an impartial jury. Perigo asserts that he was denied an impartial jury because the jury was qualified to consider a death penalty request and, thus, was more prone to convict.

Perigo concedes that this argument has been resolved against his position, as recently as *Hammers v. State* (1987), Ind., 502 N.E.2d 1339. Perigo urges this Court to reconsider the issue of guilt proneness of death-qualified juries, citing *Grigsby v. Mabry*, 637 F.2d 525 (8th Cir.1980), *on remand*, 569 F.Supp. 1273 (E.D.Ark.1983). The *Grigsby* opinion held that the defendant was entitled to a hearing on whether a death-qualified jury was more likely to convict than a jury selected without regard for juror views on the death penalty, to establish whether the defendant's constitutional right to an impartial jury was violated. Perigo, however, fails to cite the subsequent U.S. Supreme Court decision which reverses *Grigsby* and its reasoning. That reversal occurred in *Lockhart v. McCree*, 476 U.S. 162, 165, 106 S.Ct. 1758, 1761, 90 L.Ed.2d 137, 143 (1986). *Lockhart* is *stare decisis* against Perigo's position.

We affirm the trial court.

DeBRULER, GIVAN and PIVARNIK, JJ., concur.

DICKSON, Justice, concurring and dissenting.

While the cases cited in the majority opinion support the general rule that "words alone" are not sufficient provocation to reduce murder to manslaughter, they primarily arise from claims of "fighting words" as provocation. Such cases do not involve sexual infidelity, the discovery of which can support a claim of provocation.

In *Henning v. State* (1886), 106 Ind. 386, 401, 6 N.E. 803, 813, this Court stated:

> We think it abundantly settled that no man can deliberately take a woman's life, even though she is his betrothed, because he believes that she is false to him, and if he does slay her, after time for deliberation, he is guilty of murder in the first degree. If upon first discovering her infidelity he slays her, then, possibly, the killing might be reduced to manslaughter, but it is nothing less than murder, when after ample time for passion to subside, he deliberately kills her.

Claims of provocation arising from infidelity were involved in both *Wollam v. State* (1978), 269 Ind. 286, 380 N.E.2d 82, and *Harlan v. State* (1985), Ind., 479 N.E.2d 569. *Wollam* upheld a murder conviction

of a defendant who fatally shot his ex-wife, with whom he shared a "connubial and stormy relationship," after she demanded money for sexual favors and "unfavorably compared the defendant's sexual prowess with that of her other lovers." Regarding possible provocation, this Court noted:

> [t]here is nothing to show that the provocation offered by the decedent on the day of the killing was unusual in her continuing relationship with the defendant....

269 N.E.2d at 295, 380 N.E.2d at 87. In *Harlan* the giving of an instruction on the "cooling off" period was upheld where the defendant fatally shot his wife's lover three weeks after he discovered the two engaged in sexual intercourse. The Court rejected the defendant's argument that his wife's flaunting of her affair and sexual belittling of him was so continuous as to maintain sudden heat.

Significantly, neither *Wollam* nor *Harlan* cites the "mere words" or "words alone" rationale to reject the infidelity-based provocation claim. As recognized in these cases by implication, and in *Henning* by express language, discovery of infidelity may properly serve as a basis for a defense claim of provocation.

Clearly, one manner in which a person could discover such infidelity is by verbal communication. The general recital that mere words are insufficient for provocation is more appropriate to taunting or insulting words, particularly in "fighting words" cases, but it should not necessarily be applied to words informing of conduct that could properly justify a provocation claim. Provocation should be recognized when a defendant discovers qualifying inflammatory conduct, regardless whether such knowledge is acquired visually or verbally.

Upon the other issues, I concur with the majority.