Donald Lee JACKSON, Jr., Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 24S00-8811-CR-906.

Supreme Court of Indiana.

Aug. 19, 1992.

Rehearing Denied Oct. 23, 1992.

Terrance W. Richmond, Milan, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

A jury found Donald Lee Jackson guilty of robbery, a class A felony, Ind.Code § 35–42–5–1 (West 1986); kidnapping, a class A felony, Ind.Code § 35–42–3–2 (West 1986); murder, a felony, Ind.Code § 35–42–1–1(1) (West 1986); and two counts of felony murder, a felony, Ind.Code § 35–42–1–1(2) (West 1986). The jury recommended against the death penalty. The Court noted the jury's recommendation but sentenced Jackson to death. It also imposed sentences totaling 100 years in prison.

The evidence presented at trial showed that on the morning of October 9, 1986, Michelle Seagraves was kidnapped from the parking lot of her Columbus, Ohio, apartment complex, driven to Indiana in her own car, and killed. It further showed that Seagraves' car was used as the geta-

way vehicle for a robbery committed later that day.

At about 8:30 on the morning of October 9, 1986, Dona Lykins was standing on his back porch in Columbus. He saw Seagraves get into her dark blue Ford Granada and start the engine. Almost immediately, he saw a man open the driver's side door, push her into the passenger seat, close the door, and drive away on Ray Avenue.

Kelly Barnett and her cousin Amber Rose were waiting for the school bus on Ray Avenue that morning. The girls saw a dark car go down the street followed by a white Corvette. The man driving the dark car was holding a woman's head under his leg as he drove. Both cars stopped near the girls and the driver of the dark car beckoned to them. The girls ran away. When the police presented Kelly with a group of photographs, she identified Stuart Kennedy as the driver of the dark car.

George Cottingham of Moores Hill, Indiana, saw a dark car pass by three or four different times between 9:30 and 11:30 on the morning of October 9. He noted that the driver of the car was a man and that the passenger was either a small woman or a child. That evening police asked him to attempt to identify a car found parked by the railroad crossing on County Line Road in Dearborn County. He identified the dark blue Granada, Ohio license plate 722 FQG, as the same car he had seen earlier in the day.

Judith Volz was at home on County Line Road near Moores Hill on the morning of October 9. Around 10:30 or 11:00 she saw an unfamiliar dark blue car pass her house at a high rate of speed. A white Corvette followed immediately behind it. Around 12:45, she saw the white Corvette parked by the railroad tracks near her home and wrote down the license plate number. Later that afternoon, she heard there had been a bank robbery in Moores Hill. She remembered the Corvette and called the state police to report its license plate number, Ohio 465 FQU.

Between 1:45 and 1:50 p.m. on October 9, two masked men robbed the Peoples National Bank in Moores Hill. The shorter of the two jumped over the counter and began taking money from the tellers' drawers. The taller man held the bank manager at gun point and forced him to remove money from the vault. Once the money was collected, the bank manager heard the taller one tell the shorter one, "hurry up Jack" or "come on Jack." Record at 4570. The manager saw the two men leave in a dark blue Ford Granada. One of the other bank employees got a partial license plate number from the Granada, Ohio 722 ___. The manager described the shorter robber as wearing a tan or gray-greenish tee shirt and green army pants. He said the shorter robber was about 5 feet 7 inches tall, weighed around one hundred forty-five pounds, and had curly light brown hair.

Eric Ester was also in the Moores Hill area in the late morning and early afternoon of October 9. He pulled his truck over to the side of County Line Road to adjust a ladder he was transporting. Just as he got back into his vehicle, a blue Granada with Ohio plates passed him. The car went over the hill toward the railroad tracks. As Ester drove toward the tracks, a white Corvette took off and started up the other side of the hill. When he reached the tracks the blue Granada was parked there. He was unsure of the exact time he saw this apparent exchange of cars.

After talking with the bank manager, Columbus police officers, Eric Ester, Judith Volz, and George Cottingham, the Indiana State Police ran a check on the Corvette's license plate number and determined that the car was registered to Donald Lee Jackson of Columbus, Ohio. A background check on Jackson revealed that he fit the general description of the shorter bank robber and that he had a prior conviction for armed bank robbery. Because the Corvette had Ohio plates, the Indiana police reported the information about Jackson along with the license plate number of the blue Granada to the police in Columbus, Ohio. A check by Columbus police determined that the blue Granada was registered to Michelle Seagraves.

Early on the morning of October 10, officers Whalen and VanGundy of the Columbus Police Department went to 2101 West Mound Street in Columbus, where Jackson was living, to stake out his Corvette. Jackson came out of the house at 7 a.m. carrying a bundle. The officers watched him go to the car and put his hand on the door handle. They then drove around to block his exit. When they pulled in behind him, he was just getting out of the car. They identified themselves as police officers and placed Jackson under arrest. Jackson did not resist. Officer Whalen reached into the open driver's side door and moved newspapers on the passenger seat. Under the newspapers he found a brown paper sack with about $5000 in currency and a Styrofoam box with a .45 caliber semiautomatic pistol, a submachine gun, and two magazines for those weapons. He did not remove those items from the car. Very shortly after Jackson's arrest, Officer Arbie Skaggs from the crime scene search unit of the Columbus Police Department arrived. Officer Skaggs removed the guns and money, some papers, a flat black strap, and several other items from the Corvette.

An officer transported Jackson to the Columbus Police Department where Jackson talked with homicide detective Clarence Sorrell. Jackson told Sorrell that Stuart Kennedy kidnapped Seagraves by forcing her into the passenger seat of her own car, that he followed Kennedy and Seagraves to Indiana, that he and Kennedy robbed the bank a few minutes after Kennedy killed Seagraves, and that he tried to stop Kennedy from killing her. He also told Sorrell that Seagraves had not been shot in the face. Following the conversation at the station, Jackson led Sorrell, other police officers, and two FBI agents to an area near West Chester, Ohio, where they located some of the stolen money, and to Moores Hill, Indiana, where they recovered the body of Michelle Seagraves. On the way back to Columbus, Jackson told Sorrell that the clothes he and Kennedy wore during the bank robbery were in a dumpster behind a particular T.J. Maxx store in Columbus. An FBI agent later recovered the clothes from the dumpster.

A pathologist conducted an autopsy on Michelle Seagraves on October 10. He determined that she had been hit in the head with a blunt instrument, strangled with a flat black strap which was still around her neck, and shot in the back of the neck with the bullet exiting just above her left eye. Death was caused by a combination of the strangulation and the gunshot wound. Either by itself could have caused death.

### I. Jury Override

■ We turn first to the issue of whether the trial court properly sentenced Jackson to death after the jury recommended against death. This Court has held that in order to sentence a defendant to death after a jury has recommended against death, the facts so clearly justify the death penalty that the jury's recommendation is unreasonable. *Martinez Chavez v. State* (1989), Ind., 539 N.E.2d 4, 5.

■ The evidence in this case clearly indicates that Stuart Kennedy was the one who forced his way into Michelle Seagraves' car and drove her to Indiana. A ballistics expert testified that the bullet that killed Michelle Seagraves could have come from a .41 caliber magnum revolver which he tested. Police found that revolver among Stuart Kennedy's possessions. The expert was not asked to test either of the guns recovered from Jackson's Corvette.

On the other hand, Jackson's statement revealed that he was at best a few yards away when Seagraves was killed and that he joined Kennedy in the bank robbery minutes after her death. The State also introduced a number of items recovered from the dumpster behind the T.J. Maxx, including *three* bloody gloves and the army pants Jackson was wearing during the bank robbery. Examination revealed human blood on the pants; however, the blood was on the back of the right leg and could have splattered from around ten feet away.

The prosecution's posture during the trial of Stuart Kennedy seemed to be that Kennedy was the principal perpetrator. In

that trial, the prosecution argued to the jury:

> Let me also take just a moment to assure you that come the next trial of Donald Jackson in April of this year in another county in Indiana, Franklin County, I believe it is, the prosecutors are not going to argue that Donald Jackson beat her in the head with a rock and shot her and strangled her. Let me tell you why. She was strangled with this, this was on her early on in the car for control. He put it on her. He was the one in the car with her.... Another reason why we're not going to be saying Donald Jackson bashed her in the head, strangled her and shot her is because of eleven and a half Turn Tek shoes, found in the dumpster. Do you remember the testimony of what was found on those shoes. The blood of Michelle Seagraves found on the defendant's shoes. We won't argue that Donald Jackson pulled the trigger of this gun to finally end the life of Michelle Seagraves. There's absolutely no evidence to support the claim of Mr. Kiefer that somehow this gun was in the hand of Donald Jackson. We know it was in the possession of the defendant, Stuart Kennedy. It was in his bag and that's why he lied to the FBI when he was arrested because he knew the murder weapon was there and if the FBI went back to the girlfriend's house, they'd find it. It wasn't Donald Jackson that pulled the trigger that sent that shell through her head. It wasn't Donald Jackson that had his eleven and a half shoes splattered with blood. It was the defendant, Stuart Kennedy.

Record at 5299B (transcript of final argument by Dale Williams at 14–16, *State of Indiana v. Stuart Kennedy*, Cause No. 16C01–8704–CF045).

The evidence suggests that Jackson's level of participation varied in the kidnapping, the killing, and the bank robbery. There is room for reasonable disagreement over whether the facts clearly point to the death penalty as the appropriate form of punishment. Because it cannot be said that the jury's recommendation was unreasonable under the evidence available, the trial court should not have overridden the jury's recommendation.

## II. Donald Jackson's Convictions

In addition to challenging the imposition of the death penalty, Jackson appeals his conviction. We condense the issues as follows:

A) Whether trial court correctly admitted evidence resulting from Jackson's warrantless arrest and the search of Jackson's Corvette conducted after that arrest;

B) Whether trial court correctly admitted into evidence statements Jackson made to detective Sorrell on October 10;

C) Whether the trial court correctly denied Jackson's motion to suppress evidence resulting from his body search;

D) Whether the trial court correctly overruled Jackson's motion to dismiss the charges of robbery and felony murder;

E) Whether the trial court ruled correctly on various challenges of prospective jurors;

F) Whether the trial court correctly permitted the jury to view certain sites and not others;

G) Whether the trial court properly admitted a mug shot of Jackson;

H) Whether the trial court properly admitted various photographs of Seagraves' body taken at the scene of the crime and before and during the autopsy; and

I) Whether the prosecuting attorney engaged in misconduct.

### A. Arrest and Car Search

Jackson argues that his arrest and the search of his car following his arrest, both without a warrant, violated his rights under the fourth amendment to the United States Constitution. He claims the trial court improperly admitted evidence gathered during that search.

An arrest without a warrant is proper when it is supported by probable cause. *Poore v. State* (1986), Ind., 501 N.E.2d 1058. Probable cause exists where

the facts and circumstances within the officers' knowledge are sufficient in themselves to warrant a person of reasonable caution to believe that the person being arrested has committed or is in the process of committing an offense. *Heffner v. State* (1988), Ind., 530 N.E.2d 297, 300 (citing *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). Information obtained by one officer may be relied upon by other law enforcement officials who are called upon to assist in the investigation and arrest of a suspect, as long as the officer who obtained the information possessed probable cause to make the arrest. *Heffner*, 530 N.E.2d at 300 (citing *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

■ When officers Whalen and VanGundy arrested Jackson, they were relying on information known to Sergeant Jim Theobald of the Indiana State Police and Detective James Longerbone of the Columbus Police Department Robbery Squad. From talking with witnesses and other preliminary research, the investigating officers had amassed a great deal of information. They knew that the Peoples Bank of Moores Hill had been robbed by two armed, masked men and that the bank manager's description of the smaller robber roughly fit the description of Donald Lee Jackson. They also knew that the taller robber had called the smaller robber "Jack," and that Jackson had a prior conviction for armed bank robbery. Finally, the police had interviewed witnesses who had seen: (1) Jackson's white Corvette following a blue Granada in the Moores Hill area earlier in the day, (2) Jackson's Corvette parked by the railroad tracks shortly before the robbery occurred, (3) the robbers driving away in a blue Granada, (4) a blue Granada disappearing over a hill immediately before a white Corvette drove away from the same spot, and (5) a blue Granada parked by the railroad tracks.

These facts and circumstances were sufficient to warrant a person of reasonable caution to believe that Jackson had committed armed robbery. The police had probable cause to arrest Jackson.

■ Jackson argues that even if his arrest was legal, the scope of the car search exceeded the permissible bounds for a search incident to arrest. This, too, must fail, for "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981).

Because the police had probable cause to arrest Jackson, they may, "as a contemporaneous incident of that arrest," search his automobile. *Id.* That Skaggs conducted his search after Jackson had been removed from the scene is of no moment. *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *see also California v. Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

The trial court properly refused to suppress the evidence seized incident to Jackson's arrest during the search of his automobile.

B. Admissibility of Jackson's Statement

Jackson argues that the trial court improperly admitted an incriminating statement he gave to Detective Clarence Sorrell on October 10. He claims the evidence should have been suppressed because his statement was involuntary and because Sorrell continued to question him after he had invoked his right to counsel.

This Court reviewed the standards for determining the voluntariness of a confession in *Light v. State* (1989), Ind., 547 N.E.2d 1073:

Recent U.S. Supreme Court opinions focus on two areas of inquiry: 1) whether the alleged coercive police activity violated the U.S. Constitution and 2) whether the defendant's will was overborne by such coercive activity. Coercive police activity is a necessary prerequisite to finding a confession is not "voluntary" within the meaning of the due process clause of the fourteenth amendment. A review of the trial court's decision essentially examines the defendant's "will to resist," which must not be overborne;

nor can his "capacity for self determination [be] critically impaired." This analysis ultimately turns "on the effect of the totality of the circumstances on the defendant's will." It matters not whether the statement was true or false or even if there is ample evidence aside from the confession to support the verdict. What matters is only whether the statement would not have been given but for coercive government influences.

*Id.* at 1077 (citations and footnote omitted).

■ The circumstances surrounding Jackson's statement demonstrate that his will was not overborne by Sorrell's questioning. The transcript and tape of the statement reveal that although Jackson was upset while he was speaking, he was awake, alert, and free from the influence of drugs and alcohol. Sorrell did not make Jackson any specific promises nor did he threaten Jackson. Particularly telling was Jackson's question early in the interview as to whether he could be "guaranteed to go to a Federal pen" if he told "everything." Record at 5195 (statement at 3). This request indicates that the questioning did not render Jackson incapable of considering whether talking to the police was in his best interest.

■ In addition to general complaints about the coercive atmosphere, Jackson specifically claims that Sorrell coerced his statement by misrepresenting his legal rights. Sorrell read Jackson his legal rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He then added:

> You have the right to set here and keep your mouth shut ... say nothing to us ... and we're gonna get up and we're gonna walk outta the room ... but you also have the right.... to tell us ... exactly what happened ... and that may be in your best interest. Do you understand what I'm sayin'?

Record at 5195 (statement at 8) (ellipses in original). Jackson claims this confused and coerced him. At the time Jackson made his statement, he had completed fourteen years of formal education. In addition, he had a prior conviction for robbery, suggest-

ing that he had heard his *Miranda* rights before. Finally, Jackson had a written copy of his *Miranda* rights in front of him while Sorrell was speaking. Jackson was clearly capable of understanding his rights, and nothing Sorrell said was likely to confuse him. Thus we cannot conclude from the record before us that Jackson was coerced into making an incriminating statement.

■■ Jackson also claims that Sorrell continued to question him after he had invoked his right to counsel. Under the fifth and fourteenth amendments to the United States Constitution, a suspect has the right to the presence and advice of counsel during custodial interrogation by the police. *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Once the suspect asserts his right to counsel, the interrogation must cease until counsel has been made available to him or until the suspect initiates further communication with the police and knowingly and intelligently waives the right to counsel which he previously invoked. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). "[A]n accused's post-request responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Smith v. Illinois*, 469 U.S. 91, 92, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984) (per curiam). If a suspect's request for counsel is perceived to be inherently ambiguous, or equivocal in light of the preceding events, any further questioning should be narrowly limited to clarifying whether the suspect actually wished to have counsel present. *Sleek v. State* (1986), Ind., 499 N.E.2d 751. Jackson claims he invoked his right to counsel during the following portion of the conversation:

> Det. Sorrell  Okay. Do you understand your rights, Don?
>
> D. Jackson  (No audible response....)
>
> Det. Sorrell  Okay. Need you to sign right there.... go ahead and read.
>
> D. Jackson  Is it possible to have a lawyer here?

**Det. Sorrell** It's possible. Do you ... do you know a lawyer that would come in here? Okay ... you're the one that's gonna ... you know ... you can do that.

**D. Jackson** Well, I.... I.. I'd just like somebody here with me ... (very low mumbling ... inaudible ...)

**Det. Sorrell** Again, everything is up to you. You know ... you're ... you're the man in charge here. The only thing ... the only thing in the world I'm saying ... at this point is ... if somebody else .. if there is somebody else who did something more serious here ... then this is the last time we're gonna have a chance to talk about it. Okay?

**D. Jackson** (No audible response....)

**Det. Sorrell** Other than that, it looks like ... you're on the line ... and again ... I sa ... as I said before ... it would behoove you to get that all out ... at this point ... so that we can get on with this thing ... get the rest of it done .. and get ... get it cleaned up. We been ... we been busy since yesterday ... as you could well tell ... so we ... I think ... you know ... at ... at this point ...

**D. Jackson** I need help.

Record at 5195 (statement at 9–10) (ellipses in original).

Jackson's question concerning counsel was equivocal, and Sorrell's response to it was quite appropriate. Jackson was not a stranger to the legal system, and asking him if he knew a lawyer who would come in was within the permissible bounds of clarifying whether he actually wanted a lawyer. Even after Jackson responded that he just wanted "somebody," Sorrell continued to give Jackson the opportunity to invoke his right to counsel by telling him that he, Jackson, was the one in charge. Rather than requesting a lawyer, Jackson signed the waiver of rights form and talked to Sorrell. Jackson knowingly and intelligently waived his right to counsel; both his statement and the evidence derived from his statement were admissible at trial.

### C. Body Search

Jackson contends that the application police made for a body search warrant in the Columbus, Ohio, municipal court was inaccurate and misleading. He claims that the resulting warrant and the search conducted pursuant to it violated his fourteenth amendment right to due process and his fourth amendment right to be free from illegal searches and seizures. He says evidence derived from that search was improperly admitted at trial.

The warrant authorized the police to obtain hair samples from Jackson's head, arm, chest, and pubic region, and samples of his blood and saliva. Police are allowed to take samples of this sort from a defendant without a warrant provided no unreasonable intrusion is involved. *See State ex rel. Keller v. Criminal Court* (1974), 262 Ind. 420, 317 N.E.2d 433; *Heald v. State* (1986), Ind., 492 N.E.2d 671. The samples in this case were taken by a trained technician at the Columbus jail where Jackson was being held, and there is no indication in the record that any unreasonable intrusion was involved. The trial court properly admitted evidence obtained from the body search and results of tests conducted with that evidence.

### D. Charging Errors

Jackson contends that the trial court erred in denying his motion to dismiss the charges of felony-murder and robbery as a class A felony. He asserts that the charges should have been dismissed because he and Kennedy did not kill Michelle Seagraves "while committing"[1] the robbery and because the robbery did not "result in serious bodily injury"[2] to anyone.

---

**1.** The felony murder portion of the murder statute states: "A person who: (2) kills another human being *while committing* or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery; commits murder, a felony." Ind.Code § 35–42–1–1(2) (West 1986) (emphasis added).

**2.** The robbery statute states in pertinent part:

Sec. 1. A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1) by using or threatening the use of force on any person; or

The general phrase "results in" does not render the robbery statute ambiguous. *Bailey v. State* (1980), 274 Ind. 318, 322, 412 N.E.2d 56, 59. "If an injury to any other person arises as a consequence of the conduct of the accused in committing a robbery, the offense is properly regarded as a class A felony." *Id.* The "while committing" language in the murder statute is equally broad. *See generally Mahone v. State* (1989), Ind., 541 N.E.2d 278. When a killing and a robbery are so closely connected in time, place, and continuity of action as to constitute one continuous transaction, a jury is justified in finding that the perpetrator is guilty of felony murder even if the killing actually occurred before the robbery. *See id.* at 280; *Thompson v. State* (1982), Ind., 441 N.E.2d 192, 194.

The evidence in this case shows that Michelle Seagraves was kidnapped and murdered so that Kennedy and Jackson could use her car as transportation to and from the robbery of the Peoples Bank in Moores Hill. Jackson told Detective Sorrell that they robbed the bank "a few minutes" after Seagraves was killed. Record at 5195 (statement at 31). Her murder was a consequence of the plan to commit robbery, and the two events were closely connected in time, place, and action. The trial court correctly denied Jackson's motion to dismiss.

### E.   Jury Selection

Jackson claims that he was denied his rights to due process of law and a fair trial because the trial court ruled incorrectly on challenges for cause of five prospective jurors.

First, Jackson argues that the trial court committed reversible error when it excused Gaylene Wyatt for cause. Mrs. Wyatt had been tentatively selected as a juror early in the voir dire process. Several days later, Mrs. Wyatt called one of Jackson's lawyers regarding a legal matter of her own which was completely unrelated to Jackson's case. The defense attorney told the trial court about the conversation, and the court called Mrs. Wyatt back in for subsequent questioning by both sides. It appeared that Ms. Wyatt and Jackson's lawyer had not discussed the case at all. Nevertheless, the trial court excused her for cause saying:

> I—, I know Mrs. Wyatt and I know she would make every attempt to be fair and impartial in this matter, but I think for all concerned, it would be best if she were excused as a juror, so—, I thank you and, and you should feel, you should not concern yourself with the reasons for this, and I know what was done was done in good faith. But, but we will excuse you, and I thank you for coming in.

Record at 3436.

The grant or denial of a challenge to a juror is within the discretion of the trial court. *Woolston v. State* (1983), Ind., 453 N.E.2d 965. This Court will reverse only if the decision is illogical or arbitrary. *Id.* A juror's bias or prejudice for or against the defendant is one ground for a challenge for cause. Ind.Code § 35–37–1–5(11) (West 1986). Actual bias is not necessary. *Woolston*, 453 N.E.2d at 967. A juror's relationship with one of the parties may raise a presumption of bias. *Id.*

Here, the trial court went a step beyond the idea of bias implied from a relationship with a party to bias implied from a relationship with a party's attorney. Although a juror may sit on a jury when she knows an attorney or the judge, the situation at issue goes beyond knowledge or prior contact. Wyatt contacted Jackson's attorney *after* she had been tentatively selected as a juror. Bias in Jackson's favor could certainly be implied from this unusual circumstance. Consequently, we conclude that the trial court's decision to

---

(2) by putting any person in fear; commits robbery, a Class C felony. However, the offense is a ... Class A felony if it results in *serious bodily injury* to any person other than a defendant.

Ind.Code § 35–42–5–1 (West 1986) (emphasis added).

excuse Wyatt for cause was neither illogical nor arbitrary.

Next Jackson argues that the Court improperly denied his challenges for cause to prospective jurors Peters and Rehberger because both individuals were predisposed to find him guilty. The *Woolston* standard applies.

■ In response to the lawyers' questions, Peters stated that he believed that a mockery had been made of the death penalty by leaving people on death row for extended periods of time at taxpayers' expense. He also said that in his opinion a defendant ought to take the stand if he has nothing to hide. After Peters made several statements of this sort, the prosecutor objected to defense counsel's questions because they were eliciting Peters' personal opinions rather than determining whether Peters could apply the law as instructed by the trial court. Defense counsel then asked Peters a series of questions on whether he could apply the law as the trial court instructed him, and Peters answered all of them in the affirmative. The trial court did not excuse Peters for cause, and defense counsel used a peremptory challenge. Because Peters said he could apply the law as the court instructed, the trial court's decision not to excuse him for cause was neither arbitrary nor illogical.

■ Rehberger stated that he thought Jackson probably did commit the crimes based on what he had read in the newspaper and seen on television. In response to further questioning, however, he said that he could form an opinion based on what he heard in court and that he did not believe that he would be influenced by what he already knew. In response to further questioning, Rehberger said that he believed that the defendant should have to testify in his own defense and prove his innocence. Defense counsel challenged him for cause. The court indicated that counsel's challenge was premature, instructed Rehberger on the relevant law, asked Rehberger if he could follow the law, received an affirmative response, and denied the challenge for cause. Defense counsel exercised a peremptory challenge

to excuse Rehberger. Like Peters, Rehberger said he was able to apply the law as instructed by the trial court. The trial court's refusal to excuse Rehberger for cause was neither arbitrary nor illogical.

■ Finally, Jackson argues that the trial court improperly excused prospective jurors Ball and Hendrix because of their inability to vote to impose the death penalty. He claims that neither of these people met the standards for exclusion set in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). We think that a jury recommendation against execution may moot this issue, but it is nonetheless apparent that the trial court ruled correctly.

In *Witherspoon*, the United States Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777 (footnote omitted). The Court further noted that a defendant could be executed if the only persons excluded from the jury were "those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" *Id.* at 522 n. 21, 88 S.Ct. at 1777 (emphasis in original).

The record indicates that Hendrix was excused after the State exercised a peremptory challenge. Record at 3544. Consequently, it is immaterial whether or not he was excludable under *Witherspoon*.

Ball stated unequivocally that there were no circumstances under which she could recommend the death penalty and that she was completely against it. Defense counsel then asked her if she could consider the death penalty for Charles Manson, and she answered that she was still against the

death penalty. Finally defense counsel asked if she could consider the death penalty for Adolph Hitler, and she responded that she could consider it. The trial court then had the following conversation with Ball:

COURT: Is there any murder situation in which you might recommend the death penalty?

A: I'm just completely against—

Q: And your, your answer to that would be no?

A: Yes.

*Id.* at 4346. The judge allowed the prosecutor to ask another question about the death penalty and then excused Ball for cause.

Ball's answers made it clear that she would vote against the imposition of capital punishment in any case. The fact that she said she could *consider* the death penalty for Adolph Hitler does not make the trial court's ruling improper. Ball was properly excused for cause under *Witherspoon.*

### F. Jury View

The trial court allowed the jury to view the sites of the robbery and murder in Indiana, but did not allow the jury to view the site of the kidnapping in Columbus, Ohio. Jackson claims he was prejudiced by this omission because a view of the Columbus apartment complex from which Seagraves was kidnapped would have aided the jury in determining witness credibility.

The trial court judge told jury that they would not be going to Columbus because it was too difficult to insure the bus for an out-of-state trip. He then offered both sides an opportunity to re-present exhibits depicting the scene of the kidnapping. Defense counsel made no objection to the cancellation of the view and did not re-present any exhibits.

■ A jury's view of a location is not evidence. *Carroll v. State* (1982), Ind., 438 N.E.2d 745. It is simply intended to aid the jury's understanding of the evidence presented at trial. *Id.* A defendant does not have a substantive right to have the jury view a site connected to a crime. Whether such a view will be allowed is left

to the trial court's discretion. *Id.* A trial court does not abuse its discretion if the viewing would not be materially helpful to the jury or if photographs or other evidence adequately present the situation. *Id.*

■ Several photographs were admitted in this case showing the scene of the kidnapping and the location of the eyewitness. Although viewing the scene might have been helpful to the jury, the photographs adequately presented the situation. The trial judge did not abuse his discretion in denying the jury view.

### G. Admission of Mug Shots

■ Jackson argues that admission of two "mug shots" taken the night of his arrest was unduly prejudicial and deprived him of the right to a fair trial. We have traditionally disapproved the use of "mug shots" out of concern that jurors may infer a criminal history from the photographs. *Ratcliffe v. State* (1990), Ind., 553 N.E.2d 1208. If the circumstances under which the photograph was taken are described to the jury so as to foreclose the inference of prior criminal activity, however, a trial court may admit the photograph.

■ The "mug shots" admitted in this case show Jackson with a placard around his neck that says: COLUMBUS OHIO PD, FRANK IN CO SHERIFF, 10 10 86. A police identification number appears on the placard directly below Columbus Ohio PD, but it has been almost completely crossed out with a pen. Two things about the photograph made its admission proper. First, the date on the board was 10 10 86, the day that Jackson was arrested. Second, Theresa Riley, Jackson's girlfriend, specifically testified that the photograph depicted Jackson as he appeared in October 1986. The photographs were properly admitted. *Beadin v. State* (1989), Ind., 533 N.E.2d 144, 146–47.

### H. Photographs of the Victim

Jackson objects to the admission of twenty-six photos taken before and during the autopsy of Michelle Seagraves. He claims that the photos were gruesome, repugnant,

and cumulative and were used by the State to prejudice the jury against Jackson.

▆▆▆▆ Admission of photographic evidence at trial is within a trial court's discretion; we review such rulings on the basis of abuse of discretion. *Perigo v. State* (1989), Ind., 541 N.E.2d 936. Admission of photographs that depict gory, revolting, or inflammatory details of the crime is not sufficient basis for reversal, unless the photographs are without relevance to any material issue. *Id.* Photographs are generally admissible as long as they depict the subject of testimony which would be admissible if described orally by a witness. *Id.*

▆▆▆▆ Photographs taken after or during the course of the autopsy are particularly suspect. They are not admissible if they show the body in an altered state and do not clearly illustrate a fact, *Loy v. State* (1982), Ind., 436 N.E.2d 1125, or if they do not shed light on a relevant issue, *Kiefer v. State* (1958), 239 Ind. 103, 153 N.E.2d 899, *cert. denied*, 366 U.S. 914, 81 S.Ct. 1089, 6 L.Ed.2d 238. Such photographs are condemned because their tendency to enlighten the jury is dubious, while their tendency to arouse sympathy for the victim and indignation against the accused is great. *See Thacker v. State* (1990), Ind., 556 N.E.2d 1315.

▆▆▆ All of the photos Jackson complains about in this case were admitted during testimony of the pathologist who performed the autopsy on Seagraves. The pathologist identified State's Exhibits 53 A–F as photos of various parts of Seagraves' body as she appeared when he first examined her, State's Exhibits 53 G–M as photos of her body before he cleaned it for the autopsy, State's Exhibits 53 N–P as photos of Seagraves neck and back after cleaning, and State's Exhibits 53 Q–Z as photos taken during the course of the autopsy. Record at 5231, 5236, 5234–35. The State withdrew exhibits O and I because the trial court found that they were cumulative. *Id.* at 5240–41. No reason was given for the State's decision to withdraw exhibit Z. *Id.* at 5252.

The pathologist used the photos to illustrate his testimony regarding Seagraves injuries and the cause of her death. State's Exhibits 53 A–P were not cumulative, and they clearly shed light on the cause of Seagraves' death. The trial judge properly admitted them. The photographs taken during the autopsy were also properly admitted. They show only close up views of the inside of Seagraves skull and her brain. No autopsy marks, instruments, or stitches are visible. The photographs illustrate the gun powder residues left inside her skull, and the trauma caused by the repeated blows to her head; they would have helped the jury understand the pathologist's testimony.

### I.  Prosecutorial Misconduct

▆▆▆ Jackson argues that the prosecutor's conduct at trial constituted reversible error. He claims that the State changed its theory of the case from Kennedy's trial to Jackson's trial, claiming in Kennedy's trial that Kennedy alone kidnapped and killed Seagraves, and claiming in Jackson's trial that Jackson participated in both crimes. Jackson bases his claim primarily on the prosecutor's closing argument in Kennedy's trial. After the State rested, Jackson sought to admit a transcript of that argument and a copy of the Decatur Circuit Court's sentencing order for Kennedy into evidence. The trial court judge excluded the documents from evidence on relevancy grounds; however, they became a part of the record as a result of defense counsel's offer to prove.

The State's closing argument in Kennedy's trial clearly implicates Kennedy as the triggerman, but it does not suggest that Jackson was a non-participant in the crimes. *See* Record at 5299B. Consequently, we conclude that the State did not change its theory, and we reject Jackson's claim of prosecutorial misconduct.

We affirm the convictions and the 100–year sentence. We vacate the death penalty.

DeBRULER and KRAHULIK, JJ., concur.

GIVAN, J., dissents with opinion.

DICKSON, J., dissents without opinion.

GIVAN, Judge, dissenting.

I respectfully dissent from the majority opinion's conclusion that the death penalty should be set aside.

As stated in the majority opinion under the heading *"D. Charging Errors,"* the evidence clearly shows that the victim was kidnapped and murdered in order that Kennedy and Jackson could use her car in the commission of a robbery. The trial court was thoroughly justified in deducing from the evidence that throughout the entire episode, including the kidnapping of the victim, Kennedy and Jackson were acting in concert, and their intention from the inception of the crime was to kill the victim. Under these circumstances, I think it is immaterial as to which one inflicted the fatal injury, although the evidence in this case does not exclude either as the actual killer.

The Supreme Court of the United States has stated several times that the death penalty may be invoked where the defendant was a major participant in the felony and acted with reckless indifference to human life. *See Tison v. Arizona* (1987), 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127. I can attach no significance to the fact that the prosecutor argued during the prosecution of Kennedy that he in fact was the triggerman.

Because Jackson participated throughout the entire episode, I would affirm the trial court's imposition of the death penalty. I concur with the majority opinion in all other respects.