Alan L. MATHENEY, Petitioner,

v.

Ron ANDERSON, Superintendent, Respondent.

No. 3:98 CV 183 AS.

United States District Court, N.D. Indiana, South Bend Division.

July 30, 1999.

Marie F Donnelly, Alan Freedman, Chicago, IL, for Alan L Matheney, petitioner.

Andrew L Hedges, Michael A Hurst, Indiana Attorney General, Indianapolis, IN, for Ron Anderson, Superintendent, respondent.

## MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

Petitioner, Alan Lehman Matheney, was convicted of murder in a state court trial conducted in South Bend, Indiana, and was sentenced to death by the judge conducting that trial upon the recommendation of the jury that heard the case. The within petition was filed by counsel in this Court on April 14, 1998 and oral argument was heard in South Bend, Indiana on July 9, 1998. This Court greatly appreciates the high degree of professional competence displayed by appointed counsel for this petitioner.

The extensive state record has been filed and examined by this Court under the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) and under the mandates of the Antiterrorism and Effective Death Penalty Act (AEDPA) 28 U.S.C. § 2244(b). Immediate reference is made to the two decisions in this case by the Supreme Court of Indiana, namely *Matheney v. State,* 583 N.E.2d 1202 (Ind. 1992), *cert. denied,* 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238 (1992) and *Matheney v. State,* 688 N.E.2d 883 (Ind.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999). This petitioner is now confined on death row at the Indiana State Prison in Michigan City, Indiana in this district.

As a preliminary matter, this court notes that on July 21, 1999, this court received by fax two documents from attorney Alan Freedman, counsel for petitioner. Both documents were authored *pro se* by Matheney. The first is a motion to the Supreme Court of Indiana to allow Matheney to proceed *pro se* and to have attorneys Alan Freedman and Marie Donnelly removed as legal counsel. The second is a motion to this court to withdraw his appeals. The court notes that as of the date of this opinion, these documents have not been received directly from Matheney or filed in the official court file. Thus, the court will address the petition for writ of habeas corpus on the merits as presented by counsel.

### I. Factual and Procedural Background

On and immediately before March 4, 1989, this petitioner was incarcerated in the Correctional Industrial Complex at Pendleton, Indiana, upon a sentence imposed in a court in St. Joseph County, Indiana on November 23, 1987, for battery upon Lisa Bianco, his former wife, and for confinement of his children [1]. On March 4, 1989, the appropriate authorities of the Indiana Department of Corrections authorized this petitioner to have an eight hour pass release from the Correctional Indus-

---

1. On his first unsupervised visitation with the minor children after his divorce from Bianco in June, 1985, Matheney took the children on July 3, 1985 and left the South Bend area, traveling to Windsor, Ontario, Canada, Washington D.C., and somewhere in North Carolina over a period of approximately six weeks. Eventually, Matheney made a phone call to the St. Joseph County Sheriff's Department, which call was traced, leading to his apprehension in North Carolina. This formed the basis of the confinement charge against him.

trial Complex at Pendleton, Indiana. The pass was limited both as to time and locale and authorized only a trip to Indianapolis. Notwithstanding these limitations, the petitioner immediately drove to the South Bend area, went to the house of a friend, Rob Snider, changed clothes, removed an unloaded shotgun from that house and took it with him. Snider and the occupants of the house disclaim any knowledge of the petitioner removing the aforesaid unloaded shotgun. He then drove to an area in Mishawaka, Indiana, which, as every Hoosier geography student must know, is a side by side city municipality with South Bend. He parked near the house occupied by Lisa Bianco and broke into it through the back door. She ran from that house pursued by this petitioner, and the chase was witnessed by neighbors who saw it and testified about it. He caught Bianco and beat her to death with the shotgun, which broke into pieces. One observer confronted the petitioner, chased him to his car, which he got in and drove away. He soon thereafter surrendered to police authorities. The autopsy indicated that Bianco died as a result of trauma to the head from a blunt instrument.

In the lengthy and complicated proceedings in the state court it does not appear that this petitioner ever seriously disputed the facts with regard to the killing of Lisa Bianco by him. He thus does not make a challenge to this federal habeas petition on the basis of factual or actual innocence. *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The total tactics with reference to the defense of this case are complicated and must be reviewed in some considerable detail, but it appears that the fundamental thrust of the defense was not to dispute the killing but to argue for some version of insanity. The centerpiece of his contentions for paranoid delusional disorder was that his ex-wife, Lisa Bianco, and Michael Barnes, then the elected prosecuting attorney of St. Joseph County, Indiana, were having an affair and that his imprisonment at the Pendleton correctional facility was a part of a con-spiracy between his ex-wife and the local prosecutor to keep him out of the way.

A two count information for murder and burglary was filed against this petitioner on March 7, 1989 and was amended on March 20, 1989 to include the presence of two aggravating circumstances for the purpose of imposing capital punishment. The initial charge was signed by Richard Bonne, a Mishawaka police officer, and the additional counts were signed by Prosecutor Michael Barnes. These charges were filed in the St. Joseph Superior Court in South Bend, Indiana, before the Honorable Jeanne J. Swartz (now Jordan). Judge Swartz appointed the Public Defender's Office to represent Matheney, and on March 14, 1989, Philip Skodinski entered his appearance as a public defender on behalf of Matheney. On March 21, 1989, Charles Lahey entered his additional appearance on behalf of Matheney. It is undisputed that neither of these attorneys had ever previously tried a capital murder trial.

On March 14, 1989, the date of his entry into the cause, Skodinski filed a notice of insanity defense and request for examination for purposes of determining competency to stand trial and sanity at the time of the offense. That motion was granted, and Judge Swartz appointed Drs. Myron Berkson and George Batacan to perform the mental examination. Although the reports of Drs. Berkson and Batacan were not a part of the record below either on direct appeal or on post-conviction relief, they have been presented to this court. Dr. Batacan's undated report does not address the question of competency for trial, but does opine that Matheney was sane at the time of the offense. Dr. Berkson's report, dated April 19, 1989, notes in its initial paragraph that the request for examination included both questions of sanity and competency, but his report only addresses the sanity issue, in which Dr. Berkson found Matheney to be sane at the time of the offense. At his deposition on May 22, 1989, Dr. Berkson referred to a prior occasion when he had opined on

Matheney's competency in 1987, in which case he had found Matheney to be competent for his sentencing in the battery and confinement case. During the prosecutor's examination of Dr. Berkson at the deposition, Dr. Berkson mentioned that he had discussed the roles of the judge, prosecutor and defense counsel with reference to making a competency determination, but nowhere in the deposition did he proffer his opinion as to Matheney's competency in 1989.

On March 20, 1989, the state moved for a change of venue, which Matheney, by counsel, opposed. As the parties did not agree on the change of venue, Judge Swartz recused herself and provided a panel of St. Joseph County judges from which the parties could select a new judge. After the selection process, Judge William Whitman was assigned the case on March 27, 1989.

While the cause was before Judge Whitman, Matheney filed several *pro se* motions, including a motion for appointment of counsel on July 19, 1989, a motion for immediate hearing on motion for appointment of legal counsel on August 2, 1989, and a motion for change of venue on December 21, 1989. Matheney also sent letters directly to Judge Whitman, including a letter on August 7, 1989 which accompanied his August 2 motion and further asked the judge to recuse himself because Matheney wanted to call him as a witness. Shortly after that last motion, Matheney's attorneys filed a motion for change of judge on December 28, 1989. Judge Whit-

man held a hearing on the *pro se* motion for change of venue and motion for change of judge on January 2, 1990. In that proceeding this petitioner told Judge Whitman that the case should be moved from St. Joseph County, Indiana because of the relationship between Lisa Bianco and Michael Barnes. He claimed that that relationship prevented him from securing competent counsel and expressed concern that defense witnesses might be threatened or harassed. He also claimed that he had consulted with at least ten attorneys about the case. He also expressed concern about the wiretap on his family's telephone. He told Judge Whitman that an expert corroborated the phone tap and he complained about the police breaking into his relatives homes to steal evidence. After that hearing, Judge Whitman granted the motion for change of venue, and after the parties made their strikes against the list provided by Judge Whitman, the cause was transferred to the Lake County Superior Court on January 25, 1990. On that same day, attorneys Skodinski and Lahey filed a motion to withdraw as counsel due to their status as part-time public defenders.

Judge James Letsinger of the Lake County Superior Court took jurisdiction of the case on January 29, 1990, and on January 30, 1990, he denied the motion to withdraw filed by attorneys Skodinski and Lahey. However, he did appoint Scott L. King as local counsel on February 1, 1990, and King[2] became lead counsel for Matheney.

---

**2.** Scott L. King is certainly well known to this court as a criminal defense lawyer who is and was death penalty qualified under Rule 24(B) of the Indiana Rules of Criminal Procedure. *See e.g. Drake v. State,* 655 N.E.2d 574 (Ind.Ct.App.1995); *Chapman v. State,* 650 N.E.2d 764 (Ind.Ct.App.1995); *Kiner v. State,* 643 N.E.2d 950 (Ind.Ct.App.1994); *Stahl v. State,* 616 N.E.2d 9 (Ind.1993); *Babin v. State,* 609 N.E.2d 3 (Ind.Ct.App.1993); *Rouster v. State,* 600 N.E.2d 1342 (Ind.1992); *Heiser v. State,* 596 N.E.2d 965 (Ind.Ct.App.1992); *Demontigney v. State,* 593 N.E.2d 1270 (Ind.Ct.App. 1992); *Johnson v. State,* 587 N.E.2d 138 (Ind.

Ct.App.1992); *Maisonet v. State,* 579 N.E.2d 660 (Ind.Ct.App.1991); *Carr v. State,* 579 N.E.2d 663 (Ind.Ct.App.1991); *Fleming v. State,* 579 N.E.2d 73 (Ind.1991); *Jackson v. State,* 563 N.E.2d 1310 (Ind.Ct.App.1990); *Ceroni v. State,* 559 N.E.2d 372 (Ind.Ct.App. 1990); *Sheron v. State,* 553 N.E.2d 1200 (Ind. 1990); *Watkins v. State,* 551 N.E.2d 1145 (Ind.1990); *Wesby v. State,* 550 N.E.2d 321 (Ind.1990); *Terry v. State,* 545 N.E.2d 831 (Ind.1989); *Kelley v. State,* 543 N.E.2d 638 (Ind.1989); *Rocha v. State,* 542 N.E.2d 190 (Ind.1989); *Minniefield v. State,* 539 N.E.2d 464 (Ind.1989); *Nixon v. State,* 539 N.E.2d 483 (Ind.Ct.App.1989); *Stinson v. State,* 539

On March 6, 1990, attorney King filed a motion to add Michael Barnes, the prosecutor of St. Joseph County, as a witness, due to a letter Barnes had written to Matheney's parents in January, 1989, referring to Matheney as a "very sick man." King sought to have Barnes testify as a lay witness to Matheney's insanity. The prosecutor opposed that motion on March 9, 1990, on the basis that Barnes was not making the statement in a medical sense and that Matheney was attempting to manipulate the process by making Barnes a witness. Judge Letsinger denied the motion in a hearing on March 9, 1990, and denied the motion when it was offered again at trial.

Judge Letsinger conducted the trial of the case in South Bend, Indiana with a sequestered jury from citizens located in Lake County, Indiana. The review here is under 28 U.S.C. § 2254(d)(1), and the facts found by the highest court in the State of Indiana are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). The focus is on violations of the statutes, treaties and Constitution of the United States, *Bell v. Duckworth*, 861 F.2d 169 (7th Cir.1988), *cert. denied*, 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). The focus is not on violations of state law, *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). In this case,

as is required by both state law and the Constitution of the United States, the issues as between guilt and penalty were bifurcated but submitted to the same jury. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

During the guilt phase, the defense consisted of two kinds of testimony: first, the testimony of a prisoner at Pendleton in an effort to place part of the blame for Bianco's death on the officials at Pendleton who gave Matheney the pass; and second, the testimony of former attorneys of Matheney, his sisters, Dr. Charles Arens and Dr. Helen Morrison, in an effort to show that Matheney was legally insane at the time of the offense. Attorney Michael Scopelitis testified for over 200 pages of transcript about his attorney-client relationship with Matheney between 1980 and 1987. Scopelitis represented Matheney in his divorce from Bianco and on the criminal confinement charge. He testified that during the fall of 1986 and into 1987, Matheney exhibited bizarre behavior on a number of occasions, such that Scopelitis moved the court to have his competency tested. Attorney Joseph Rubin was appointed to represent Matheney on the battery charge, and he also testified as to Matheney's worsening mental condition while in jail awaiting sentencing on the battery charge.

N.E.2d 33 (Ind.Ct.App.1989); *Schneider v. State*, 538 N.E.2d 13 (Ind.Ct.App.1989); *Wilson v. State*, 537 N.E.2d 1185 (Ind.1989); *Adamov v. State*, 536 N.E.2d 281 (Ind.1989); *Manuel v. State*, 535 N.E.2d 1159 (Ind.1989); *Manley v. State*, 535 N.E.2d 553 (Ind.1989); *Diggs v. State*, 531 N.E.2d 461 (Ind.1988); *Long v. State*, 529 N.E.2d 339 (Ind.1988); *Williams v. State*, 526 N.E.2d 1179 (Ind. 1988); *Eveler v. State*, 524 N.E.2d 9 (Ind. 1988); *Carter v. State*, 521 N.E.2d 669 (Ind. 1988); *Coleman v. State*, 520 N.E.2d 1270 (Ind.1988); *Rentas v. State*, 519 N.E.2d 162 (Ind.Ct.App.1988); *Matthews v. State*, 518 N.E.2d 807 (Ind.1988); *Jackson v. State*, 518 N.E.2d 787 (Ind.1988); *Dowery v. State*, 516 N.E.2d 67 (Ind.1987); *Whiting v. State*, 516 N.E.2d 1067 (Ind.1987); *Johnson v. State*, 515 N.E.2d 536 (Ind.1987); *Daniels v. State*, 515 N.E.2d 530 (Ind.1987); *Tarver v. State*, 513 N.E.2d 176 (Ind.1987); *Holmes v. State*, 511 N.E.2d 1060 (Ind.1987); *Williams v. State*, 511 N.E.2d 450 (Ind.1987); *Ford v.*

*State*, 506 N.E.2d 835 (Ind.Ct.App.1987); *Blacknell v. State*, 502 N.E.2d 899 (Ind.1987); *Smith v. State*, 502 N.E.2d 485 (Ind.1987); *Martin v. State*, 499 N.E.2d 273 (Ind.Ct.App. 1986); *Bynum v. State*, 498 N.E.2d 108 (Ind. Ct.App.1986); *Parks v. State*, 455 N.E.2d 904 (Ind.1983); *Mahone v. State*, 429 N.E.2d 261 (Ind.Ct.App.1981); *United States v. Bhagavan*, 116 F.3d 189 (7th Cir.1997); *United States v. Morgano*, 39 F.3d 1358 (7th Cir.1994); *United States v. Buggs*, 904 F.2d 1070 (7th Cir.1990); *Edwards v. United States*, 814 F.2d 486 (7th Cir.1987); *United States v. Brooks*, 748 F.2d 1199 (7th Cir.1984); *United States v. Wisniewski*, 741 F.2d 138 (7th Cir.1984); *United States v. Bhagavan*, 911 F.Supp. 356 (N.D.Ind.1995), 911 F.Supp. 351 (N.D.Ind. 1995); *United States v. Bryant*, 895 F.Supp. 218 (N.D.Ind.1995); *United States v. Alba*, 841 F.Supp. 868 (N.D.Ind.1994); *Edwards v. United States*, 646 F.Supp. 42 (N.D.Ind.1986); *United States v. Cova*, 580 F.Supp. 588 (N.D.Ind.1984)

Matheney's sisters, Vicky Matheney–Brown and Marie Jenks, testified during the defense case as to the poor relationship between Matheney and Bianco and to the voluminous documents which he sent to his family while at Pendleton for them to copy and sign, all of which related to the alleged conspiracy between Bianco and Barnes. Attorney Tony Iemma had represented Matheney in a products liability suit against a gun manufacturer. Matheney had been shot in the leg when the gun went off accidentally. Iemma testified that he had a proposed settlement of $115,000 worked out with the manufacturer in the spring of 1985, when Matheney sent a letter directly to the counsel for the manufacturer suggesting that the suit was all lies and the gun had not malfunctioned. Iemma was eventually able to reinstate the settlement for $108,000, but he testified that Matheney had attempted to scuttle the settlement in an effort to deprive Bianco of a portion of the proceeds due to their impending divorce in the summer of 1985.

Dr. Charles Arens testified that he had met with Matheney on approximately a dozen occasions during 1985 and 1986 after he had been charged with the confinement of his children, initially while Matheney was in jail on that charge, then on several occasions after he was released on bond. Arens testified that he gave Matheney the Minnesota Multi–Facet Personality Inventory ("MMPI") while he was incarcerated at the St. Joseph County Jail in September, 1985, and on the basis of the results, Arens diagnosed Matheney with schizophreniform disorder. When Arens tested him again in April, 1986, though, Matheney tested as normal. Around that time, Matheney discontinued treatment because Bianco would not attend therapy with him. Arens saw Matheney once more, in January 1987, when Matheney visited him, accompanied by Bianco, who had clearly been abused, and Matheney admitted to abusing her. Arens recommended that Matheney take Bianco to the hospital and did not see them again.

Finally, the defense put on Dr. Helen Morrison. Dr. Morrison testified at length to Matheney's view of his relationship with Bianco. Morrison testified that Bianco had been taping her telephone conversations with Matheney, and that Matheney believed that the tapes contained evidence that he had not threatened or battered her. He became convinced that the tapes would exonerate him, and when he was unable to obtain the tapes through legal methods, he devised the plan to visit Bianco on a pass to get the tapes. Matheney told Morrison that he had visited Bianco in an effort to retrieve the tapes, and when she told him that she had called the police and he would be put away, he chased her out of the house and beat her. Morrison testified that she had listened to the tapes in question and had reviewed the reports of all previous psychological examinations and had reviewed Matheney's writings regarding Bianco. On the basis of her six hours spent interviewing Matheney and all of the other information reviewed, Morrison testified that Matheney was suffering from the mental disease of paranoid personality disorder. She was not asked, and did not offer an opinion, about the ultimate question of whether Matheney could distinguish right from wrong at the time of the offense. Morrison refused, when pressed by the prosecutor, to even offer an opinion as to whether Matheney met the legal definition of mental disease.

After the defense rested, the court called its appointed experts, Drs. Batacan and Berkson. On questioning by the court, Dr. Batacan testified that Matheney did not have a mental disease as defined by the statute, but under further questioning by defense counsel, opined that hallucinations were a symptom of every mental disease, and thus Matheney did not have a disease because he did not have hallucinations. Dr. Berkson testified that hallucinations were not required, but he concurred that Matheney was not suffering from a mental disease at the time of the offense. Dr. Berkson also testified that he did not find Matheney to be delusional, but under cross-examination by defense counsel, he agreed that if Matheney were delu-

sional, he might have been suffering a mental disease.

In closing argument, as in his opening statement, defense counsel King admitted that Matheney had committed the murder, but he argued that Matheney was insane at the time of the offense. However, he was unable to rebut the statement by the prosecutor in closing that Morrison had not opined that Matheney was unable to determine right from wrong at the time of the offense. At 8:20 p.m., April 11, 1990, the jury returned a verdict of guilty on both the murder and burglary counts. The following day, the same jury heard three witnesses testify as character witnesses on Matheney's behalf in the penalty phase of the trial. No further medical testimony was given during the penalty phase, but defense counsel did argue that the mental illness mitigator would be applicable during the closing arguments of the penalty phase. The jury returned at 8:30 p.m. on April 12, 1990 and unanimously recommended the imposition of the death penalty. On May 11, 1990, Judge Letsinger followed the recommendation the jury and entered a written order imposing the death sentence at that time.

After the entry of the death sentence, Matheney made a number of *pro se* filings with the Lake County Superior Court, including a letter requesting Judge Letsinger to order the Department of Corrections to allow him to speak with other attorneys and the media, a letter and motion seeking funds to hire "adequate assistance of legal counsel," and a motion to compel attorney Scott King to turn over Matheney's personal documents. Judge Letsinger denied the motions on the ground that the case was now before the Supreme Court of Indiana on direct appeal.

Scott King continued to represent Matheney on his direct appeal to the Indiana Supreme Court. In that appeal, King raised five issues on Matheney's behalf: did the trial court err in failing to instruct on the lesser-included offense; did the trial court err in denying the motion to call Barnes or admit the Barnes letter; did

Count III (the intentional felony murder count) properly allege an aggravating circumstance; was the evidence sufficient to support Count IV (the lying in wait charge) as an aggravating circumstance; and was imposition of the death penalty appropriate. The Indiana Supreme Court affirmed the trial court on both conviction and sentence. *Matheney v. State*, 583 N.E.2d 1202 (Ind.1992). The Supreme Court found that there was no evidence of sudden heat to support the giving of the voluntary manslaughter instruction, and that a plea of insanity was not "compatible with the inference of guilt of a lesser-included offense." 583 N.E.2d at 1206. They further ruled that the Barnes testimony was appropriately excluded because there were no "extraordinary circumstances" or "compelling reasons" to violate the rule that prosecutors cannot be called as defense witnesses. *Id.* The Court held that the intentional felony murder aggravator was not inappropriate because the legislature could have reasonably determined that "a murder committed by breaking and entering a dwelling in the place where a person should be able to feel secure" merited the death penalty. *Id.* at 1208. They found that the evidence supported the lying in wait aggravator when considering the amount of time it took from Matheney's departure from Rob Snider's home to the first 911 call, Matheney's parking away from the home, and his approaching the home through the alley. *Id.* at 1209. Finally, the Indiana Supreme Court held that the death penalty was appropriate, given the lack of mitigators, including the inability to conform to the requirements of the law mitigator, and the presence of two aggravators. *Id.* Justice DeBruler concurred as to the conviction but dissented from the penalty, finding that the evidence did not support the lying in wait aggravator and finding that several mitigators were present, including turning himself in to police and acting "under the influence of extreme mental and emotional disturbance." Matheney filed a petition for writ of certiorari to the United States

Supreme Court, but certiorari was denied. *Matheney v. Indiana,* 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238 (1992).

After the writ of certiorari was denied, the Indiana Public Defender entered her appearance on behalf of Matheney, and on November 25, 1992, a petition for post-conviction relief was filed in the Lake County Superior Court. The case was originally assigned to Judge Letsinger, but Matheney by counsel filed a motion for new judge, and on January 29, 1993, Judge Conroy, another judge of that court, assumed jurisdiction over the case. On March 9, 1994, Chief Justice Shepard of the Indiana Supreme Court instructed Judge Conroy to bring the post conviction petition to trial for decision on the merits by the end of 1994. During the summer of 1994, Matheney filed several *pro se* filings, asserting that the Indiana Public Defenders office was failing to provide him with adequate representation because they were not pursuing his recommended line of defense. Such filings were received in the record, but were refused for filing as Matheney was represented by counsel.

On September 9, 1994, counsel for Matheney amended the petition and included the allegation that Matheney had been incompetent to stand trial. This issue was raised both as an ineffective assistance of counsel claim and as a due process claim. On the same day, Matheney's counsel filed a notice of incompetence and petition to stay the proceedings. Matheney *pro se* filed several motions aimed at the notice of incompetence, including a response asking that he be allowed to prove his own competence, and letters to the disciplinary commission charging his public defenders with violating the attorney-client privilege by filing the notice of incompetency.

At the hearing on October 11, 1994 before Magistrate T. Edward Page [3], Matheney was found competent and the parties presented evidence on the petition. Matheney presented the depositions of his cousin Patty Gennicks, his attorneys, Charles Lahey, Scott King, and Phil Skodinski, Dr. Helen Morrison, and Dr. Myron Berkson, and affidavits from his mother, his sisters, and his brother Howard, all of which related incidents from Matheney's childhood, Steven Radde, who did the investigation work for the defense prior to trial, Lois Thompson, who testified at trial as Lois Nemeth, and attorney Ken Hays, who had represented him in a small claims matter and who sent a letter to the St. Joseph County Probation Department in August, 1987 regarding his belief that Matheney's personality was deteriorating in prison. In his deposition, Lahey testified that Matheney had been obsessed with his belief that Bianco was having an affair with Barnes. He further testified, though, as follows:

> Despite his obsessive conduct, I didn't find Alan that incapable of planning his own defense. In fact, he was actively planning it although it wasn't right in all regards. His defense which he wished me to make for him was—pardon my characterization of this because I believe it may very well be his own words was that—the bitch deserved it, that was really the heart of the defense that he wished me to make for him.

When questioned whether Matheney was competent to assist in his defense, Lahey answered:

> people. They want me to find Matheney incompetent but they won't tell me why." Counsel for Matheney moved to have Magistrate Judge Page recuse himself on the basis that he had prejudged the case on the basis of this remark, but he refused to do so. Any claim here concerning Magistrate Page or Matheney's incompetence at post-conviction relief was specifically abandoned at the oral argument on July 9, 1998.

3. Counsel for Matheney also filed a motion to recuse Magistrate Page for the following reason. On the day Magistrate Page received the notice of incompetence, he read in the affidavit of Dr. Smalldon that Dr. Smalldon was advised by counsel not to disclose the reasons for his finding. Magistrate Page was then in the presence of a member of the Lake County Prosecutor's Office and a member of the Indiana Public Defender's Office, and he stated in their presence "I can't believe these

Alan was about as much assistance as a mosquito bite. I mean he really was no assistance to us. I didn't necessarily attribute that to his lack of competence, though. You know, as we discussed here, his obsession with a defense which was not recognized by law let alone by a jury for Pete's sake or even the laws of morality, his obsession with that and his refusal or inability to give us—to work with us on any evidence other than along those lines that—here's a case I want you to present and here's the evidence you are going to go out and get to have me do it. When I know that I can't make that defense, it made it a chore at times to talk to him and made him of no real effective assistance to us whatsoever on what real legitimate issues existed in the case. So to that extent he was useless to us and was absolutely of not assistance. I didn't label that on the grounds of competence.

When asked if he felt Matheney was competent to stand trial, Phil Skodinski stated that:

I think he was. I mean, some of his ideas were good ideas, but that doesn't necessarily mean he wasn't competent to use his own defense. He wanted to interview people and use them as witnesses which some weren't very good people to use as witnesses. But I am not sure that's the criteria to provide you are not competent to assist in your own defense. It depends on what you feel is competent. He certainly understood what he was charged with or what evidence to find he was not guilty. In that regard I guess he was competent to assist in his own defense.

Scott King testified in his deposition that Matheney did not cooperate with counsel to the full extent of his ability "partially because he couldn't because of his mental status" and "partially because he didn't want to." He further testified that Matheney believed "she was absolutely kingpin in this conspiracy against him. No insight whatsoever into him having any culpability for any of the problems that they had had. Which, again, reinforced

my view that—I mean, that he mentally and emotionally was not fully equipped." King stated that he had a good faith belief that Matheney was mentally ill, but he also stated that Matheney made a decision "as rational as Alan would be" to go forward with the insanity defense.

Dr. Helen Morrison testified in her deposition that she felt she had been inadequately prepared by counsel. She further stated that she did not believe Matheney was insane at the time of the offense, as he knew the difference between right and wrong, but that his delusion was so overwhelming that he was unable to avoid doing what he knew was wrong. She also stated that the delusion was so strong that Matheney was not able to rationally understand the trial and that she did not believe that his condition would have improved since 1990. Dr. Berkson stated in his 1994 deposition that his finding that Matheney was sane was not inconsistent with Dr. Morrison's conclusion that Matheney was suffering from paranoid personality disorder, and Dr. Berkson further opined that he felt Matheney was suffering from paranoid personality disorder also, but that the disorder did not make him legally insane at the time of the offense.

The state presented an affidavit from the trial bailiff concerning the separation of jurors and alternates, an affidavit from the prosecutor who tried the case concerning his opinion of the efficacy of Scott King as counsel, and the deposition of Dr. Myron Berkson taken in May, 1989, after his interview of Matheney. As stated above, Dr. Berkson in 1989 opined that Matheney was legally sane and not under a delusion, but he did not give any opinion as to competency.

At the end of the hearing, Magistrate Page asked counsel for briefs, but not findings of fact. In an off the record discussion, Magistrate Page explained that he wanted an outline of the arguments. The Indiana Public Defender thus presented a brief on November 22, 1994, with an outline of the claims, but little legal cita-

tion or reference to facts in the record. The State responded on December 19, 1994 with a brief that did make some legal argument, but in a summary fashion. On April 7, 1995, the Indiana Public Defender moved the court to delay ruling so that it might supplement its brief to include record citations and legal argument. The court denied that motion and entered its findings of fact and conclusions of law on April 10, 1995. Many, if not most, of Matheney's claims were treated as waived because he failed to "state specific facts from which this court can determine the substance of the alleged error." The claims that the court did address it found to have no merit. Thus, the petition for post-conviction relief was denied.

Matheney appealed the denial to the Indiana Supreme Court. In an opinion dated November 24, 1997, the Indiana Supreme Court affirmed the decision of the post-conviction court in denying Matheney relief. *Matheney v. State,* 688 N.E.2d 883 (1997). On the appeal of his post-conviction relief, Matheney raised four due process issues and several instances of ineffective assistance of counsel. Matheney first asserted that he had been incompetent to proceed with his post-conviction petition due to his paranoid personality. The court held that the trial court held correctly found Matheney to be competent and able to assist his counsel. 688 N.E.2d at 893. Matheney then challenged the post conviction court's denial of his motion to disclose the names of the trial jurors for purposes of interviewing them. The court found that there was no evidence that the trial jurors had been tampered with, and thus affirmed the PCR court's denial. *Id.* at 894. Matheney then challenged Judge Conroy's use of Magistrate Page, both by challenging the Magistrate Act and by challenging Page personally as having been biased. The court found the magistrate act to be constitutional and Magistrate Page to have been free of bias. *Id.* at 894–96.

Matheney made several allegations of ineffective assistance of trial and appellate counsel in his appeal of his post-conviction

relief petition. The Indiana Supreme Court found the allegations unpersuasive as a whole, and only addressed a few major claims in this area. Matheney first argued that trial counsel erred in utilizing the insanity defense during the guilt phase and further erred in not pursuing the mental health mitigator during the penalty phase. The court found that there was no logical alternative strategy for counsel to employ at trial, and found that Matheney was not prejudiced by counsel's failure to elicit further testimony from Dr. Morrison during the penalty phase. *Id.* at 898–99. Matheney also asserted that his counsel was deficient in failing to raise Matheney's competence to stand trial. The court held that on the basis of the reports by Drs. Batacan and Berkson and trial counsel's own opinions of Matheney's competency, counsel were not ineffective for failing to request a hearing to determine Matheney's competency. *Id.* at 899. Matheney also complained that his trial counsel had failed to preserve fundamental errors, including prosecutorial misconduct, jury instruction errors, and the constitutionality of the Indiana death penalty statute. The court found the prosecutorial misconduct claim to have been waived, the jury instructions to have been correct statements of the law, and that the Indiana death penalty statute, and the aggravating and mitigating factors found therein, was constitutional. *Id.* at 900–08.

Finally, after the parties had filed their initial briefs before the Indiana Supreme Court, Matheney's counsel discovered that Judge Letsinger had asked the probation department to administer a pre-sentence questionnaire based on the Minnesota Multiphasic Personality Inventory ("MMPI") on Matheney, and that the questionnaire was not then presented to defense counsel prior to sentencing. Matheney challenged the questionnaire on the ground that he was unable to contest the information, which may have impacted Judge Letsinger's sentencing decision. The Indiana Supreme Court, rather than remand the case to the post-conviction

court to consider the questionnaire, independently reviewed the aggravating and mitigating circumstances and determined that the sentence was appropriate, and thus the questionnaire issue was moot. *Id.* at 909–10. Thus, the Indiana Supreme Court affirmed the post-conviction court in denying relief. Matheney filed a writ of certiorari to the United States Supreme Court pertaining to the 1997 decision of the Indiana Supreme Court, but certiorari was denied on February 22 of this year. *See Matheney v. Indiana,* —— U.S. ——, 119 S.Ct. 1046, 143 L.Ed.2d 53 (1999).

Having exhausted his state court remedies, Matheney filed his petition for writ of habeas corpus with this court on July 11, 1998.[4] In that petition, Matheney raised the following claims for review by this court: 1) that Matheney's conviction and sentence violate due process because he was not competent to stand trial; 2) that Matheney's conviction and sentence violate due process because the trial court failed to *sua sponte* hold a competency hearing; 3) that trial counsel ineffectively assisted Matheney because they failed to raise his competency to stand trial; 4) that the trial court's refusal to allow Prosecutor Barnes to be called as a witness violated Matheney's Sixth and Fourteenth Amendment rights to present favorable evidence; 5) that the trial court's refusal to instruct the jury on the lesser included offense of voluntary manslaughter violated Matheney's rights under the Eighth and Fourteenth Amendments; 6) that the trial judge's compilation of a psychological profile of Matheney without counsel's knowledge violated Matheney's Eighth and Fourteenth Amendment rights; 7) that trial counsel ineffectively assisted Matheney during the penalty and sentence phases of his trial by failing to offer evidence which proved mitigating factors; 8) that Matheney's rights under the Eighth and Fourteenth Amendments were violated because insufficient evidence supported the lying-in-wait aggravator; 9) that the lying-in-wait aggra-

vator is vague and overbroad, in violation of the Eighth and Fourteenth Amendments; and 10) that the "felony murder" aggravator is vague and overbroad in violation of the Eighth and Fourteenth Amendments. The Attorney General of Indiana filed his return to the order to show cause on March 29, 1999, and this court heard oral argument on the petition on July 9, 1999 in South Bend, Indiana.

This court must note that it has some familiarity with this petitioner, having been the presiding judge over a claim filed *pro se* by this petitioner asserting a violation of 42 U.S.C. § 1983 by Prosecutor Michael Barnes, assistant St. Joseph County prosecutor John Krisor, Dr. Hansel Foley, the St. Joseph County Police, and James Aiken of the Indiana Department of Correction, which complaint this petitioner filed on September 11, 1989 while he was incarcerated awaiting trial. That suit alleged that Matheney's constitutional right to medical treatment had been denied by Dr. Foley, the St. Joseph County Police and the Indiana Department of Corrections, that his right to a fair trial had been denied by Barnes and Krisor because of pre-trial publicity, that he had been placed in solitary confinement with no opportunity to exercise in violation of the Eighth Amendment, and that he had been denied access to the law library at the St. Joseph County Jail in violation of the Sixth Amendment. This court granted dismissed the claims against Barnes, Krisor, the St. Joseph County Police, and James Aiken on December 7, 1989, but allowed Matheney to continue his claims against Dr. Foley. On October 6, 1993, this court granted summary judgment in favor of Dr. Foley. Matheney appealed the decisions of this court *pro se* to the United States Court of Appeals for the Seventh Circuit, which affirmed this court in an unreported decision. *Matheney v. Foley,* 83 F.3d 424 (7th Cir.1996) (table). Additionally, Matheney filed a *pro se* peti-

---

4. Matheney amended his petition to add two additional claims on August 17, 1998, but he withdrew those claims, as well as Claims IV and VI from his initial petition, on June 8, 1999. The court will not address the withdrawn claims.

tion for writ of habeas corpus attacking his 1987 convictions in this court on March 8, 1991, which this court denied on May 9, 1991, as Matheney was no longer incarcerated on his 1987 convictions at that time. The Seventh Circuit summarily affirmed this court's decision on August 21, 1991. In both of those causes, Matheney represented himself in a cogent manner.

## II. Standard of Review

As a preliminary matter it does not appear that this petitioner is entitled to a further evidentiary hearing in this Court under 28 U.S.C. § 2254(e)(2) and *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). The factual record presented here is to say the least massive. The request for additional discovery is not well taken under *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997).

■ A claim under 28 U.S.C. § 2254 requires the federal habeas court to ensure that the state criminal conviction was not achieved at the expense of the petitioner's constitutional rights. Justice Stewart, speaking for the Supreme Court of the United States in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), described the role of the federal district courts in habeas proceedings:

> A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—re-

flecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Id.* at 323, 99 S.Ct. at 2791 (citation omitted).

The Congress of the United States has codified the holdings of *Jackson* and its progeny through the AEDPA, which amended 28 U.S.C. § 2254, in relevant part, as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

When Congress passed the AEDPA, the standards of review that the court must apply to the merits of a petition for writ of habeas corpus under § 2254 also changed significantly. Section 2254 was further amended in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As such, the AEDPA provides a "new, highly deferential stan-

dard for evaluating state court rulings." *Lindh v. Murphy,* 521 U.S. 320, 333 n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

It remains basic to this day that claims of constitutional violations must first be fairly presented to the state court, as defined by Justice Scalia in *Castille v. Peoples,* 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and reaffirmed most recently in *O'Sullivan v. Boerckel,* —— U.S. ——, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). In *Moore v. Parke,* 148 F.3d 705 (7th Cir.1998), the Seventh Circuit explained that:

> A prerequisite for applying this section is that the state court adjudicated the issue before us on the merits.... [Because] the state courts did not address Moore's sufficiency of the evidence argument on the merits, ... the new standard of review in AEDPA does not apply.

148 F.3d at 708. However, the court went on to explain that the petitioner must first have "provided the state courts with a full and fair opportunity to review his claims." *Id.,* citing *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). The Seventh Circuit has provided the following framework to determine whether a state court has been provided a fair opportunity to consider a petitioner's federal constitutional claims:

> If the petitioner's argument to the state court did not: (1) rely on pertinent federal cases employing constitutional analysis; (2) rely on state cases applying constitutional analysis to a similar factual situation; (3) assert the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege a pattern of facts that is well within the mainstream of constitutional litigation, then this court will not consider the state courts to have had a fair opportunity to consider the claim. However, the presence of one of these factors, particularly factors (1) or (2), does not automatically avoid a waiver; the court must consider the specific facts of each case.

*Verdin v. O'Leary,* 972 F.2d 1467, 1473–74 (7th Cir.1992). Petitioner, here represented by able and experienced death penalty counsel, has the burden to establish a basis for federal collateral relief.

### III. Competency Claims

 Petitioner's first three claims all center around his contention that he was incompetent to stand trial. The first claim is that his incompetency at trial violated his due process rights. The second asserts that the trial judge should have *sua sponte* held a competency hearing, and his failure to do so abridged Matheney's due process. Finally, Matheney asserts that his counsel ineffectively assisted him because they failed to question his competency to stand trial. As an initial matter, the state asserts that Matheney has procedurally defaulted the first two claims because he failed to raise them during his post-conviction relief proceedings. On page 81 of his appeals brief to the Indiana Supreme Court, the following heading appears:

> **Matheney's Convictions and Sentence Violate Due Process Because He Was Not Competent To Stand Trial. Trial Counsel Ineffectively Represented Matheney By Failing to Alert The Court That Matheney Was Unable to Rationally Understand The Proceedings and Unable to Assist in His Defense, and the Trial Court Neglected Its Affirmative Obligation to Inquire.**

In one paragraph of the six pages that follow that heading, Matheney asserts that

> the trial of an incompetent person can never satisfy the demands of the due process clause of the United States Constitution. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). The prohibition on trying an incompetent person is "fundamental to an adversary system of justice." *Drope v. Missouri,* 420 U.S. 162, 172, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). The right to be competent to stand trial cannot be

waived. *Pate v. Robinson*, 383 U.S. at 384, 86 S.Ct. 836.

Petitioner's Brief to Indiana Supreme Court on PCR, p. 83 (parallel citations omitted.) The following paragraph asserts the trial court's affirmative duty to resolve the question of competency. The remainder of the six pages address the facts showing Matheney's incompetency and his counsel's failure to address it. Certainly the Supreme Court of Indiana did not address the due process and *sua sponte* claims separately in its twenty page opinion in *Matheney v. State*, 688 N.E.2d 883 (Ind.1997). However, under *Porter v. Gramley*, 112 F.3d 1308 (7th Cir.1997), "a habeas petitioner must only 'fairly alert' the state court of the federal constitutional grounds for his claim, and we have stated that 'what is important is that the *substance* of the federal claim be presented fairly.'" 112 F.3d at 1315. (citations omitted) (emphasis in original). As discussed in the standard of review section *supra*, under *Verdin v. O'Leary*, if the petitioner relies on pertinent federal cases employing constitutional analysis, the court should consider the specific facts of the case to determine if a waiver has been made. *Verdin*, 972 F.2d at 1472–73. Although the due process and *sua sponte* claims were each the subject of one paragraph in a 125 page brief, it appears that the issue was adequately raised to present the issue. Thus, it appears that Matheney properly raised the claims before the state court. Given the manner in which the Supreme Court of Indiana dealt with the issue of competency to stand trial in 1990, it is the obligation of this court to examine the entirety of the record before it *de novo*. It must be emphasized, however, that it is the entirety of the record that is examined and not just fragments of it. Additionally, under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, the right to be competent to stand trial cannot be waived, and thus can be raised at any point in the process. *See Gosier v. Welborn*, 175 F.3d 504 (7th Cir.1999).

As to the third claim, that of ineffective assistance of counsel for failing to raise the issue of Matheney's competence to stand trial, that claim is judged under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on this claim, Matheney must establish two elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the United States Supreme Court held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Id.* The Supreme Court applied the *Dusky* standard to a federal habeas review of state court proceedings in *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). *See also Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) (applying *Dusky* standard to decision to waive counsel and/or plead guilty). Thus, at the time of petitioner's trial, it was clear that the Due Process Clause required that a criminal defendant be competent to stand trial. Additionally, under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), a trial court must conduct a competency hearing when the infor-

mation known to the trial court at the time of the trial is sufficient to raise a bona fide doubt regarding the defendant's competency. *Robinson,* 383 U.S. at 385, 86 S.Ct. 836. The relevant factors to be considered in assessing the issue of competency are a defendant's "irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Drope,* 420 U.S. at 180, 95 S.Ct. 896. There must be some manifestation, some conduct, on the defendant's part to trigger a reasonable doubt of his competency. *See id.; United States v. Collins,* 949 F.2d 921, 924 (7th Cir.1991). As part of making this objective inquiry, a court may also consider the attorney's representations concerning the defendant's competency. *Drope,* 420 U.S. at 177 n. 13, 95 S.Ct. 896 (noting that with respect to determining competency, "it is nevertheless true that judges must depend to some extent on counsel to bring issues into focus").

█ Focusing on the facts of this case, the place to start is the order of Judge Swartz on March 27, 1989, granting Matheney's motion for examination to determine his "competency to stand trial and sanity." As stated above, neither Dr. Batacan nor Dr. Berkson actually opined as to Matheney's competency, but both stated that Matheney was sane at the time of the offense, with no mental disease or defect. Additionally, as the Indiana Supreme Court noted in its decision, Dr. Berkson "stated that during his examination Matheney had no difficulty responding promptly to his questions, organizing his thoughts, or putting his thoughts together in a logical, sequential order." 688 N.E.2d 883. Dr. Berkson testified during his deposition in May, 1989 that he had previously found Matheney competent in 1987, although, as noted above, he was not asked about Matheney's competence in 1989.

None of Matheney's trial counsel believed him to be incompetent. Charles Lahey testified that

Despite his obsessive conduct, I didn't find Alan that incapable of planning his own defense. In fact, he was actively planning it although it wasn't right in all regards. His defense which he wished me to make for him was—pardon my characterization of this because I believe it may very well be his own words was that—the bitch deserved it, that was really the heart of the defense that he wished me to make for him.

When questioned whether Matheney was competent to assist in his defense, Lahey answered:

Alan was about as much assistance as a mosquito bite. I mean he really was no assistance to us. I didn't necessarily attribute that to his lack of competence, though. You know, as we discussed here, his obsession with a defense which was not recognized by law let alone by a jury for Pete's sake or even the laws of morality, his obsession with that and his refusal or inability to give us—to work with us on any evidence other than along those lines that—here's a case I want you to present and here's the evidence you are going to go out and get to have me do it. When I know that I can't make that defense, it made it a chore at times to talk to him and made him of no real effective assistance to us whatsoever on what real legitimate issues existed in the case. So to that extent he was useless to us and was absolutely of not assistance. I didn't label that on the grounds of competence.

Attorney Phil Skodinski testified that he felt Matheney competent, stating:

I mean, some of his ideas were good ideas, but that doesn't necessarily mean he wasn't competent to use his own defense. He wanted to interview people and use them as witnesses which some weren't very good people to use as witnesses. But I am not sure that's the criteria to provide you are not competent to assist in your own defense. It depends on what you feel is competent. He certainly understood what he was charged with or what evidence to find he was not guilty. In that regard I guess

he was competent to assist in his own defense.

Attorney Scott King did not specifically testify as to Matheney's competency. He stated that he believed Matheney to be mentally ill, but he also stated that Matheney rationally concurred in the decision to use the insanity defense.

Matheney cites the evidence of Dr. Helen Morrison to show his lack of competency to stand trial. Dr. Morrison testified that Matheney suffers from paranoid personality disorder with delusional aspects. Matheney believed, and believes, that Bianco and Barnes were engaged in an affair, and that they conspired to use the power of Barnes' office to keep him incarcerated. Morrison testified that Matheney's period of incarceration prior to the offense here caused his delusion to grow so severe that he became grossly psychotic. Based on her finding of that delusion, Morrison testified that Matheney "had no concept in my opinion of what was going on as far as his role in the trial was concerned." She did not believe that Matheney could realistically look at the facts of his situation or rationally consult with counsel.

Matheney also points to his behavior in court during various pre-trial conferences. At the end of the hearing on December 4, 1989, after the court addressed the efforts to obtain a videotape of WNDU's newscast on Dyngus Day, on which Matheney asserted there was evidence of Bianco's relationship with Barnes, Matheney asked if he could speak, then informed the court that he was speaking to several different attorneys about the case and he felt that his family members' phones, which he was utilizing to make three-way calls to various attorneys, were being tapped. Additionally he asserted that evidence had been stolen from someone and that the police had been involved. Judge Whitman, then presiding over the case, told Matheney that he would only address evidence of such incidents as was properly submitted to him. Thereafter, Matheney filed a *pro se* motion for change of venue. On December 21, 1989, the court held a hearing at which Matheney stated to the court that he was asking for the change of venue due to Bianco's relationship with Barnes, which he felt tainted his ability to obtain testimony from other attorneys in St. Joseph County. The court conducted a colloquy with Matheney personally concerning his constitutional right to be tried in St. Joseph County. After that discussion, Judge Whitman queried attorneys Lahey and Skodinski on the motion, which they opposed. Lahey stated that the court-appointed psychiatrists had "found him to be competent, so, we would indicate to the Court that we don't think that this is a matter of incompetency on Mr. Matheney's part in making the request. We just think that he is incorrect."

In considering this issue on Matheney's petition for post-conviction relief, Magistrate Page wrote that Matheney was:

> "[I]ntensely and narrowly focused on the belief that his ex-wife and the prosecuting attorney in St. Joseph county were having an affair. He believes he was imprisoned prior to the murder as part of a conspiracy between putative lovers to keep him out of the way. And finally he believes his capital prosecution for murder was an extension of that conspiracy because the prosecuting attorney wanted to forever silence the petitioner about the affair. The petitioner is so narrowly focused on this alleged conspiracy that he sees the actions of others, including those of the trial court and his own attorneys, as extensions of the conspiracy to keep the affair from being litigated in the courts."

Having said that, though, Magistrate Page and Judge Conroy found that Matheney had been competent to stand trial under the Indiana standard that an individual is not competent when he is unable to understand the proceedings and assist in the preparation of his defense. IND.CODE § 35–36–3–1(a).

On the basis of all of the facts stated above, this court finds that Matheney was competent to stand trial under the *Dusky* standard. He understood the facts of the

situation and he understood the consequences of trial and sentencing. Additionally, he provided some assistance to his counsel, perhaps not as much as they would choose, but not completely unhelpful. Importantly, none of his counsel, including the very experienced lead counsel, felt that he was incompetent. This court does not doubt that these very able lawyers would have raised the incompetence issue had it been appropriate. Although this court is well aware of Mr. Matheney's beliefs as to the alleged relationship between his former wife and the prosecutor of St. Joseph County, this court does not find that those beliefs so impeded Matheney's appreciation of his situation as to render him incompetent to stand trial. Thus, his due process right to be tried as a competent individual was not violated. Similarly, as Matheney was competent to stand trial, the trial judge's failure to *sua sponte* order a competency hearing was not a violation of his due process rights. As Matheney was competent, his attorneys' failure to raise the issue did not prejudice him and thus was not violative of his Sixth Amendment rights to effective assistance of counsel.

### IV. Barnes as Witness Claim

■ Matheney next asserts that the trial court's refusal to permit defense counsel to call Michael Barnes as a defense witness denied Matheney's right to present favorable evidence in violation of the Sixth and Fourteenth Amendments to the Constitution. One of the time bombs that these counsel surely had to consider was the insistence by this petitioner that Michael Barnes, the Prosecuting Attorney of St. Joseph County, be called as a witness for the defense. It is very hard to find in this record except from the unproven assertions of this petitioner that anything that this petitioner's counsel could have asked Prosecutor Barnes would have been in any way helpful to this petitioner, much less bring about his acquittal. It is correct that Prosecutor Barnes did testify at a pretrial hearing and admitted that he described this petitioner as "sick" in a letter because petitioner expressed no remorse for his previous arrest and conviction of battery and confinement. Barnes also testified that he believed this petitioner was sane. Other witnesses were present who could have testified on either of those subjects and in fact there was abundance of evidence on the insanity-mental health issue.

In *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the Supreme Court made clear that "it is not the province of a federal habeas court to reexamine state-court determination on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States." 502 U.S. at 67–68, 112 S.Ct. 475. In its decision on Matheney's direct appeal, the Indiana Supreme Court addressed this issue and decided it on the state law ground that counsel, and especially a prosecutor, should not be called as a witness. *Matheney v. State*, 583 N.E.2d 1202, 1206–07 (Ind.1992). Under the AEDPA, this court can only grant relief on this issue if it finds that the decision of the state court was an "unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The question is thus whether the Supreme Court of Indiana's decision on the evidentiary question was an unreasonable application of clearly established federal law. In *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), the Supreme Court held that the right to call witnesses on one's behalf has "long been recognized as essential to due process." *Chambers*, 410 U.S. at 294, 93 S.Ct. 1038. However, that court also noted that its holding did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Id.* at 302–03, 93 S.Ct. 1038. In its recent opinion in

*Gardner v. Barnett,* 175 F.3d 580 (7th Cir.1999), the Seventh Circuit recognized that while "the right of a defendant to present witnesses is 'the right to present a defense,' ... the right is not absolute and must be balanced against other legitimate interests in the criminal trial process." 175 F.3d at 584–85. In both *Chambers* and *Gardner,* a key issue for the courts was the fact that the witness not presented (or not presented fully in *Chambers*) provided significant exculpatory evidence. In fact, the three excluded witnesses in *Chambers* all would have testified to the admission of guilt by another person. There has never been any question that Matheney committed the murder of Lisa Bianco. The testimony of Barnes was simply being offered as lay testimony on the question of Matheney's sanity. As stated above, other witnesses could and did testify on that issue, and it is unlikely that Barnes' testimony would have been of any help to Matheney. Under the facts and circumstances of this case, Matheney was not deprived of a fair trial, and thus no writ should issue on this ground.

## V. Lesser Included Offense Instruction Claim

██ Matheney next asserts that the trial court's refusal to instruct the jury as to the lesser included offense of voluntary manslaughter violated his rights under the Eighth and Fourteenth Amendments. Under *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the death penalty may not be imposed "after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627, 100 S.Ct. 2382. Matheney here argues that there was sufficient evidence to support the giving of a voluntary manslaughter instruction. *Fox v. State,* 506 N.E.2d 1090 (Ind.1987) explains that "killing in the sudden heat of passion is the element that distinguishes voluntary manslaughter from murder, but there must be sufficient provocation to induce such passion to render the defendant in-

capable of cool reflection." 506 N.E.2d at 1097. "Additionally, words alone cannot constitute sufficient provocation to give rise to a finding of sudden heat warranting an instruction on voluntary manslaughter." *Matheney v. State,* 583 N.E.2d 1202, 1205 (Ind.1992) (citing *Perigo v. State,* 541 N.E.2d 936 (Ind.1989)). The evidence at trial was that Matheney was angry and growling when he entered the home, and that he became further angered when Bianco told their daughter to call the police. The Indiana Supreme Court considered this issue on Matheney's direct appeal and, applying *Perigo* and *Fox,* determined that there was "no evidence from which the jury logically could find sudden heat." *Matheney,* 583 N.E.2d at 1205.

That court also held as a matter of state law that the "trial court does not err when it refuses to instruct the jury as to a lesser-included offense in a prosecution for murder where the defense of insanity is used to disprove intent to commit the greater offense, and thus would not be compatible with the inference of guilt of a lesser-included offense." *Id.* at 1206 (citing *Rowe v. State,* 539 N.E.2d 474 (Ind. 1989)). Matheney asserts that this element of the Indiana Supreme Court decision adds an impermissible additional requirement to the *Beck* standard that a lesser-included offense instruction must be given when the evidence supports such an instruction. However, it is clear that the Indiana Supreme Court's decision is not bottomed solely on this theory, but also on the insufficiency of evidence from which to give a lesser-included offense instruction, and that is the heart of the *Beck* analysis. Thus, the Indiana Supreme Court's decision is not an unreasonable application of *Beck,* for purposes of the AEDPA, and no writ should issue on this claim.

## VI. Presentence Questionnaire Claim

██ Matheney's next claim is that his rights under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment were violated by the fact that,

without notice to him or his counsel, the sentencing judge received and reviewed a psychological questionnaire pertaining to Matheney prior to sentencing him to death, and by the Indiana Supreme Court's belief that it could cure that error by reweighing the evidence. Much is said in the record with regard to the way that Judge Letsinger went about sentencing of this defendant. Whatever else may be said about the process, it must be said that he went about the task in great detail and with great care. Whether or not the particular questionnaire that he used is a wise procedure is not the question. The question is whether or not it violates the Eighth Amendment of the Constitution of the United States particularly as interpreted twenty-two years ago in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). The factual setting here with reference to the use of the questionnaire is different than that outlined in the plurality opinion in *Gardner* by Justice Stevens. In *Gardner*, the trial court relied upon a confidential portion of the presentence investigation report to reject the recommendation of the jury and impose the death penalty. 430 U.S. at 352–53, 97 S.Ct. 1197. Here, unlike *Gardner*, the judge ultimately accepted the recommendation of the jury. It is undisputed that, under the procedure in Indiana, a state trial judge can impose the death penalty even when a jury fails to recommend it. *Schiro v. State*, 451 N.E.2d 1047 (Ind. 1983); *habeas relief denied sub nom. Schiro v. Clark*, 754 F.Supp. 646 (N.D.Ind. 1990), *aff'd*, 963 F.2d 962 (7th Cir.1992), *aff'd sub nom. Schiro v. Farley*, 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994), *post conviction relief granted in Schiro v. State*, 669 N.E.2d 1357 (Ind.1996). The other side of that coin appears to be that a state trial judge in Indiana can decline to impose the death penalty even when a jury recommends it, although that didn't happen in this case.

On review of the post-conviction relief court, the Supreme Court of Indiana examined this issue under the teachings of *Gardner*. *Matheney v. State*, 688 N.E.2d 883, 908–10 (Ind.1997). Although the court appeared to be sure that the trial court judge had not relied upon the undisclosed information in determining the sentence, and thus not in violation of *Gardner*, they independently reviewed the aggravating and mitigating circumstances to determine if the death penalty was appropriately invoked. *Id.* at 909. Although the Supreme Court of the United States remanded *Gardner* to the trial court, rather than the Florida Supreme Court, for reconsideration of the sentence, that was based, in part, on the belief that the judge might be swayed by the attorney's arguments regarding the secret information to follow the jury's recommendation of life in prison. Here, where the jury, the judge, and the Indiana Supreme Court have all found that the aggravating circumstances all outweigh the mitigating circumstances, or lack thereof, this court finds that, like the Indiana Supreme Court, little purpose would be served by a remand. This Court finds no Constitutional error in the totality of the sentencing procedures of Judge Letsinger as they are reflected in the record of this case.[5]

## VII. Effective Assistance in Penalty and Sentencing Claim

Matheney then asserts the claim that he was denied his right to effective assistance of counsel at the penalty and sentencing phases of his trial, rendering his death sentence unreliable in violation of the Sixth and Fourteenth Amendments to the Constitution. As with the claim above asserting ineffective assistance in the failure to raise competency, this claim is judged under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on this claim, Matheney must establish two

---

5. It must be noted that this questionnaire was never in any way given to the jury that recommended the death penalty.

elements: first, that counsel's performance fell below an objective standard of reasonably effective representation; and second, that the "deficient performance prejudiced the defense." *Id.* at 687–88, 104 S.Ct. 2052. For the first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. 2052. On the second prong, the petitioner must show a "reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

As a preliminary matter, the court must note that the State of Indiana has adopted standards for the appointment of qualified counsel in capital cases. Rule 24 of the Indiana Rules of Criminal Procedure sets forth the qualifications counsel must possess in order to become appointed counsel in a capital case.[6] Although Rule 24 was not in effect in its current state at the time of trial, it is clear from the record that Scott King was qualified under the rule to serve as lead counsel and that both Char-ley Lahey and Philip Skodinski were qualified to serve as co-counsel. Therefore, it is proper to conclude that Matheney's counsel as a whole had experience in capital cases and with the requirements of presenting mitigation evidence on his behalf.

There isn't any question that the petitioner as a defendant in a capital criminal case is entitled to effective assistance of counsel in the penalty phase. The penalty phase often presents enormously difficult professional challenges and choices. *Resnover v. State,* 460 N.E.2d 922 (Ind.1984), *cert. denied, Resnover v. Indiana,* 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984), *post-conviction relief denied, Resnover v. State,* 547 N.E.2d 814 (Ind.1989), *cert. denied, Resnover v. Indiana,* 498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 175 (1990), *habeas relief denied, Resnover v. Pearson,* 754 F.Supp. 1374 (N.D.Ind.1991), *aff'd,* 965 F.2d 1453 (7th Cir.1992), *cert. denied sub nom. Resnover v. Carter,* 508 U.S. 962, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993), *denial of habeas aff'd, Resnover v. Pearson,* 9 F.3d 113 (7th Cir. 1993), *cert. denied sub nom. Resnover v. Carter,* 512 U.S. 1246, 114 S.Ct. 2769, 129 L.Ed.2d 883 (1994). The suggestion that

---

6. Rule 24 of the Indiana Rules of Criminal Procedures states in pertinent part as follows:

(B) Appointment of Qualified Trial Counsel. Upon a finding of indigence, it shall be the duty of the judge presiding in a capital case to enter a written order specifically naming two (2) qualified attorneys to represent an individual in a trial proceeding where a death sentence is sought. The provisions for the appointment of counsel set forth in this section do not apply in cases wherein counsel is employed at the expense of the defendant.

(1) Lead Counsel; Qualifications. One (1) of the attorneys appointed by the court shall be designated as lead counsel. To be eligible to serve as lead counsel, an attorney shall:

(a) be an experienced and active trial practitioner with at least five (5) years of criminal litigation experience;

(b) have prior experience as lead or co-counsel in no fewer than five (5) felony jury trials which were tried to completion;

(c) have prior experience as lead or co-counsel in at least one (1) case in which the death penalty was sought; and

(d) have completed within two (2) years prior to appointment at least twelve (12) hours of training in the defense of a capital cases in a course approved by the Indiana Public Defender Commission.

(2) Co–Counsel, Qualifications. The remaining attorney shall be designated as co-counsel. To be eligible to serve as co-counsel, an attorney shall:

(a) be an experienced and active trial practitioner with at least three (3) years of criminal litigation experience;

(b) have prior experience as lead or co-counsel in no fewer than three (3) felony jury trials which were tried to completion; and

(c) have completed within two (2) years prior to appointment at least twelve (12) hours of training in the defense of capital cases· in a course approved by the Indiana Public Defender Commission.

Dr. Morrison be called in the penalty phase of the trial involved a judgment call on the part of counsel and the petitioner as to whether or not Dr. Morrison would do more harm than good. That choice had to be made on the basis of a wide variety of factors that relate to what is persuasive at that critical juncture in a trial. The Indiana Supreme Court considered this issue in its decision on post conviction relief. *Matheney v. State*, 688 N.E.2d 883, 898–99 (Ind.1997). That court found that the issue failed on the prejudice prong of the *Strickland* standard. *Id.* at 898. Although trial counsel may have erred in failing to bring Dr. Morrison back to the stand during the penalty phase, "they did elicit testimony from her at the guilt phase which could support the presence of [the inability to conform] mitigator." *Id.* Matheney argues that this logic exemplifies the circular reasoning condemned in *Hall v. Washington*, 106 F.3d 742 (7th Cir.1997). In *Hall*, the defense counsel failed to present several witnesses who would have testified to mitigating behavior, then compounded the error by making his closing argument based solely on personal and religious beliefs, with almost no reference to the mitigating factors in Hall's favor, 106 F.3d at 750. The Seventh Circuit granted the writ, finding that counsel's failure to present mitigating evidence, combined with his legally inappropriate argument, resulted in deficient performance which was prejudicial to Hall. *Id.* at 752. The trial court on post-conviction relief and the Illinois Supreme Court had found the newly offered mitigating evidence to be cumulative, but the Seventh Circuit found that where the sentencing court had found a total lack of mitigating evidence, "it is logically impossible for the new evidence to be 'cumulative' to something in the earlier record." *Id.* While the trial court here did not find that the evidence supported the "inability to conform" mitigator, evidence was presented at trial to support that finding. More importantly, counsel did argue the presence of that evidence to the jury in his closing argument in the penalty phase. Unlike *Hall*,

where the mitigating evidence was not presented or argued to the court, the mitigating evidence was argued and presented here. Although eliciting further testimony from Dr. Morrison may have highlighted the relevant information for the jury and judge, it was not completely absent from the record. The decision of the Indiana Supreme Court that the failure to elicit additional testimony from Dr. Morrison during sentencing did not create "a reasonable probability that the result of the proceeding would have been different" was not unreasonable. *See Jones v. Page*, 76 F.3d 831 (7th Cir.1996).

## VIII. "Lying in Wait" Aggravator Insufficient Evidence Claim

█ Matheney further argues that his Eighth and Fourteenth Amendment rights were violated because no reasonable trier of fact could have found beyond a reasonable doubt that the state established the elements for the "lying in wait" aggravating circumstance. Under *Lewis v. Jeffers*, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), this court is to determine whether a rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt, viewing the facts in the light most favorable to the prosecution. The Seventh Circuit has explained that "federal review of these claims ... now turns on whether the state court provided fair process and engaged in reasoned, good-faith decisionmaking when applying *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ]'s 'no rational trier of fact' test." *Gomez v. Acevedo*, 106 F.3d 192, 199 (7th Cir.) *vacated on other grounds sub nom. Gomez v. DeTella*, —— U.S. ——, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997).

Among the statutory factors to be considered under the law of Indiana for the imposition of the death penalty, there is a so-called "lying in wait" factor. Such was considered by the Supreme Court of Indiana both on direct appeal and on the petition for post-conviction relief. The undisputed evidence is that this petitioner

parked his car two houses away from Bianco's house despite the fact that there were no parked cars in front of that house. Footprints were found in a muddy alley that ran from where the petitioner parked his car to Bianco's backyard, and the shoes this petitioner was wearing at the time of his arrest were muddy. The backyard was isolated and secluded by dense brushes along the perimeter and was obscured by branches, a large wooden gate and the garage. Under these facts it was reasonable for the state trial court and the Supreme Court of Indiana to conclude that this petitioner used a circuitous route toward the victim's house in order to conceal himself from her. The time factor was also considered and is important. In any event, no showing of a violation of the Eighth Amendment of the Constitution of the United States has been made.

### IX. Vague and Overbroad Aggravator Claims

Matheney also asserts that his Eighth and Fourteenth Amendment rights were violated because Indiana's "lying in wait" and felony murder aggravating circumstances are vague and overbroad. The Supreme Court of the United States requires that aggravating circumstances in a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). "If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).

Matheney first argues that the "lying in wait" aggravator is vague and overbroad. The Indiana Supreme Court defined this aggravator in *Davis v. State*, 477 N.E.2d 889, 896 (Ind.1985) as "waiting, watching, concealment, and taking the victim by surprise." It requires "watching, waiting, and concealment from the person killed with the intent to kill or inflict bodily injury upon that person." *Id.* The Indiana Su-

preme Court considered this argument both on direct appeal and on post-conviction relief and found that the definition adequately narrowed the class of persons eligible. This court does not find that determination unreasonable.

Similarly, Matheney argues that the felony murder aggravator is vague and overbroad because "the majority of homicides are committed in conjunction with another crime. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)." *Matheney v. State*, · 688 N.E.2d 883, 905 (1997) and Petitioner's Memorandum in Support, p. 59. The Indiana Supreme Court considered the identical claim on post-conviction relief and determined that the felony murder aggravator was not overbroad because it applies to only to defendants who commit intentional murder while committing specific other crimes. As the Indiana Supreme Court's decision was reasonable, no habeas relief is appropriate.

### X. Incompetence to be Executed Claim

Petitioner's final claim in his petition is that he is incompetent to be executed. Under *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Eighth Amendment prohibits execution of a defendant who is insane. The claim must be presented to the state court, however, when execution is imminent prior to obtaining federal relief. *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981). Petitioner has asked that this claim be dismissed without prejudice for refiling if appropriate at a later date under *Stewart v. Martinez-Villareal*, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998), and such will be done.

### XI. Conclusion

In his dissent in *Coleman v. Balkcom*, 451 U.S. 949, 955, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981), Justice Thurgood Marshall wrote that "[b]ecause of the unique finality of the death penalty, its imposition must be the result of careful procedures and must survive close scrutiny on post-trial review." This court has

closely scrutinized the record and finds no Constitutional errors therein. Specifically, the court holds that Matheney was competent to stand trial, and thus his due process right to be tried as a competent individual was not violated, nor was due process violated when the trial judge failed to *sua sponte* hold a competency hearing. Matheney's trial counsel were not ineffective when they failed to ask for a competency hearing and when they argued at the penalty and sentencing phases of the trial. The trial court's decision to bar the testimony of Prosecutor Barnes was not a violation of the Sixth and Fourteenth Amendments to the Constitution, nor was its use of the presentence investigation questionnaire a violation of the Eighth and Fourteenth Amendments. Finally, the evidence supported the "lying in wait" aggravator, and that aggravator and the felony murder aggravator are not overbroad or vague. For those reasons, the court now **DENIES** Matheney's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, except for Claim XIII of the petition, which the court now **DISMISSES** without prejudice as premature. The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**